**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE IN TRUST FOR THE BENEFIT OF THE HOLDERS OF HUDSON'S BAY SIMON JV TRUST 2015-HBS, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2015-HBS, BY SITUS HOLDINGS, LLC, IN ITS CAPACITY AS SPECIAL SERVICER, <br><br> Plaintiff, <br><br> -v- <br><br> HUDSON'S BAY COMPANY, HUDSON'S BAY COMPANY ULC, AND HBC L.P., <br><br> Defendants. | Civil Action No. <br><br><br><br> **VERIFIED COMPLAINT** |

Wilmington Trust, National Association, as Trustee (the "Trustee") in Trust for the benefit of the Holders (the "Certificateholders") of Hudson's Bay Simon JV Trust 2015-HBS (the "Trust"), Commercial Mortgage Pass-Through Certificates, Series 2015-HBS, by Situs Holdings, LLC, in its capacity as Special Servicer ("Situs" or the "Servicer"); the Trust as successor to JPMorgan Chase Bank, National Association, Column Financial Inc., and Bank of America, N.A. (the "Lender," and together with Servicer in its capacity as such and Trustee, collectively, "Plaintiff"), acting by and through its undersigned attorneys and by way of Complaint against Hudson's Bay Company ("HBC"), Hudson's Bay Company ULC ("Hudson ULC"), and HBC L.P. ("HBC Bermuda," and, together with HBC and Hudson ULC, collectively, "Defendants"), alleges as follows:[1]

## <u>INTRODUCTION</u>

1.     Plaintiff brings this action for declaratory judgment and injunctive relief in response to Defendants' clandestine corporate shell game that has looted the credit support for

---

[1] Capitalized terms used but not otherwise defined herein are as defined in the Loan Agreement (defined below).

Lender's nearly $850 million, first lien secured loan (the "Loan").  Defendants engaged in deliberate and concealed corporate restructurings that stripped assets from HBC – a well-financed, Canadian former public company, and the absolute and unconditional ultimate guarantor of the Loan – and transferred them to newly formed, foreign entities in violation of numerous provisions of governing loan documents and related guarantees.

2.       Over the last six months, in an apparent classic misdirection to draw attention to the right hand while the coin vanishes in the left, Defendant HBC engaged Plaintiff in purported discussions about potential paydowns of the then-performing Loan.  In the meantime, however, and unbeknownst to Plaintiff, Defendants consummated a series of transactions to take-private the ownership of HBC and divert its assets to newly-formed foreign entities, in what Defendants have since labeled "certain internal restructuring transactions" (the "Improper Transfers").  These Improper Transfers were only uncovered when the Servicer provided a signature block on a document for HBC and was advised that HBC was no longer the ultimate guarantor.  Even more galling, although Defendants' Improper Transfers predate and have nothing to do with the COVID-19 pandemic, Defendants have seized on the crisis as an opportunity to try to smokescreen their numerous breaches of their obligations.

3.       Defendants' actions have gutted Plaintiff's contractual rights to know and maintain the identity of its ultimate guarantor, be provided with advance notice of proposed restructuring transactions, and to give or withhold consent thereto, leaving Plaintiff without bargained-for protections surrounding key credit support for the Loan, at a time when such unconditional, absolute guaranty may be most critical.  Moreover, Defendants have failed and refused to provide any meaningful transparency in response to Plaintiff's repeated demands for information since uncovering the Improper Transfers; instead, Defendants have rationed out, in a "move along, nothing to see here" manner, only dribs and drabs of irrelevant and incomplete documents, and conclusory assurances that Plaintiff need not be concerned.  This, while press reports imply that assets previously supporting Plaintiff's guaranty may be removed from reach

forever, as they are diverted to make an outside-of-the-Loan purchase of an already bankrupt major retailer.

4.     Plaintiff has no adequate remedy at law for the deprivation of its rights with respect to the maintenance of the identity and financial capacity of its ultimate guarantor, and its rights to advance notice and consent with respect to any proposed changes thereto.  Plaintiff has suffered irreparable harm as a result of the Improper Transfers, and is threatened by further irreparable harm unless: (i) Defendant HBC Bermuda is prohibited, during the pendency of this action, from transferring, assigning or dissipating assets that it obtained through Improper Transfers that should be declared void; and (ii) Defendants are required to come clean, in detail, about what they have done to the bargained-for credit support for the Loan.

5.     Thus, Plaintiff brings this action for: (i) injunctive relief, to maintain the status quo by requiring Defendant HBC Bermuda to refrain from transferring, assigning and/or dissipating any assets it received as a result of the Improper Transfers; (ii) an order directing Defendants to provide expedited discovery with regard to the HBC take-private transaction (the "Take-Private Transaction") and the Improper Transfers, relating to the collateral and/or assets that directly or indirectly supported the Loan prior to and following the consummation of those events; and (iii) declaratory judgment finding that Defendants' actions breached the Loan Documents (defined below), and thus declaring the Improper Transfers void.

6.     Defendant HBC was the ultimate parent of numerous operating entities that operate Lord & Taylor and Saks Fifth Avenue ("Saks") retail stores — household names in the retail clothing industry.  The Trustee is the trustee of a commercial mortgage-backed securities trust that is the Lender (by assignment) for a nearly $850 million mortgage loan made to borrower entities who are landlords to their retail store tenants.  HBC is the unconditional and absolute guarantor of the borrower entities' tenants' operating leases, which means it must step in and pay rent when the tenants are unable to do so for any reason, including financial distress.

7.     The purpose of these Operating Lease Guarantees (as defined below) is to protect the Lender's Loan collateral from impairment due to the failure of the borrowers' tenants

to pay their rent when due.  Indeed, the provision of unconditional and absolute guarantees of the borrowers' tenants' lease obligations by HBC was a major inducement for the Lender to make the loan in the first place.

8.      Upon information and belief, in June 2019, HBC's controlling shareholders submitted a proposal to HBC for a transaction by which HBC would be taken private.  Plaintiff was not made aware of the proposal.  To the contrary, HBC reaffirmed the Operating Lease Guarantees in November 2019, and as recently as January and February 2020, engaged in discussions concerning a potential paydown of the Loan.

9.      Instead, however, HBC proceeded with a series of surreptitious restructurings comprising the Improper Transfers that, as subsequently and belatedly described by borrowers' counsel, resulted in significant – and potentially complete – impairment of the practical value of the Operating Lease Guarantees.  HBC was taken private and, through various related corporate maneuvers that still have not been fully disclosed to Plaintiff, purportedly became Defendant Hudson ULC.  In addition, HBC assets were transferred to yet another new entity, Defendant HBC Bermuda.

10.      The result of these Improper Transfers was that a credit-worthy, bargained-for guarantor with real assets and substantial financial wherewithal was apparently dissolved, its assets removed to a newly-formed foreign entity and its successor left as perhaps only a shell, with no requisite notice to or consent by the Lender, and no transparency or information as to whether any purported substitute guarantor(s) – which Defendants were not permitted to substitute – are financially capable of discharging the obligations under those guarantees, all in clear breach of the Loan Documents, as discussed below.

11.      Defendants kept the existence of the Improper Transfers a secret from Plaintiff until April 2020 (and have provided almost no details since).  At that time, the borrowers had missed their April debt service payment on the loan because their tenants had not paid that month's rent under the operating leases.  This nonpayment of rent, which was to be used to fund

debt service on the Loan, was the primary and specific issue the Operating Lease Guarantees were meant to address.

12.    Notwithstanding its recent discussions concerning a potential paydown of the Loan, and the long horizon of visibility that HBC had with respect to the borrowers and their lease tenants, it was only on April 1, 2020, the day the debt service payment was due, that the Lender was given notice that the payment would not be made.  Moreover, only after the Servicer: (i) proposed a draft pre-negotiation agreement (the "Proposed PNA") to cover discussions regarding *inter alia* borrowers' missed Loan payment; (ii) negotiated its terms; and (iii) exchanged draft versions until it believed the parties had agreed upon an execution copy, did counsel for the borrowers finally reveal that, as a result of the previously-undisclosed Improper Transfers, HBC was supposedly no longer the guarantor under the Operating Lease Guarantees.

13.    Had the Servicer not asked for HBC's signature on the Proposed PNA, Plaintiff would almost certainly still be in the dark about Defendants' machinations and the corporate shell game taking place with respect to the Operating Lease Guarantees.  Additional correspondence between the parties, as detailed herein and attached as exhibits hereto, only served to confirm that Defendants have no intention of providing Plaintiff with transparency as to what actually happened, and the specific impact of the Improper Transfers on the Operating Lease Guarantor, and also on the Non-Recourse Carve-Out Guarantor (defined below).

14.    Defendants' concealment of their deliberate, complex corporate maneuvers was no accident.  The Operating Lease Guarantees expressly prohibit their assignment by the guarantor without the prior written consent of the Beneficiary (here, the Lender).  Indeed, the Operating Lease Guarantees provide that any assignment in violation of the consent right "will be void."

15.    Likewise, the transfer of assets and indirect ownership interests in the borrowers from HBC to HBC Bermuda constitute "Transfers" by "Restricted Parties" under the Loan Agreement.  Based on the (minimal and conclusory) descriptions of the Improper Transfers provided to date by HBC, the Loan Agreement – like the Operating Lease Guarantees – also

required Lender's consent, because the Improper Transfers did not constitute "Permitted Transfers."

16.     Furthermore, even if the Improper Transfers were Permitted Transfers under the Loan Agreement (they were not), the Loan Agreement still unambiguously required that, as a condition to *any* Transfer, Plaintiff receive – at a minimum – notice of and information regarding any proposed restructuring at least ten business days before accomplished.  No such notice was provided.

17.     These notice and consent provisions were designed to provide Lender with certainty that the bargained-for, ultimate guarantor of its Loan would remain the guarantor until either the Loan was repaid, or a suitable "Replacement Guarantor" (*i.e.*, and among other things, with a minimum net worth of $2.5 billion) was accepted.  Defendants' actions, carried out without any notice, deprived Plaintiff of its contractual rights to review, withhold consent, and/or challenge the Improper Transfers before they were consummated.  Now, Plaintiff is forced to seek judicial redress to be put back in the position it bargained for, and the position it would still be in, but for Defendants' improper actions.

18.     Moreover, Defendants have destroyed Plaintiff's bargained-for contractual rights to receive notice and information concerning the identity and financial status of the guarantor under the critical Operating Lease Guarantees.  In addition to assuring Lender that its ultimate guarantor will maintain the financial capacity to perform all of its obligations, the carefully constructed protections against assignments and transfers without Lender consent are critical to insure that the guarantor, *inter alia,* is subject to service of process in the jurisdiction of New York, is not identified on the OFAC List (defined below), and is not, directly or indirectly, entitled to diplomatic or sovereign immunity.  Plaintiff has no adequate remedy at law for Defendants' deliberate deprivations.  As a result, Plaintiff has suffered irreparable harm and continues to be threatened by further irreparable harm in the absence of the relief requested herein.

19.     Therefore, Plaintiff requests that the Court grant its application: (i) for temporary restraints and preliminary injunction to maintain the status quo during the pendency of

this matter by prohibiting Defendant HBC Bermuda from engaging in transfers, assignments, and/or dissipation of assets transferred or assigned to it from HBC in violation of the Loan Documents; and (ii) for expedited discovery with regard to the Take-Private Transaction and related Improper Transfers; Defendants' assets, shareholders, and general and limited partners; and other information and financial information concerning Defendants, as requested herewith.

**PARTIES**

**A. Plaintiff**

20.     Wilmington Trust, National Association (the "Trustee") is a national bank with its principal place of business located in Wilmington, Delaware.

21.     Hudson's Bay Simon JV Trust 2015-HBS, Commercial Mortgage Pass-Through Certificates, Series 2015-HBS (the "Lender"), is a commercial mortgage-backed securities trust.

22.     Situs Holdings, LLC is a Delaware limited liability company with its principal place of business located in San Francisco, California.  Situs is the Special Servicer and is contractually authorized to take certain actions, including initiate this litigation, in its representative capacity on behalf of the Trust pursuant to Section 3.1 of the Trust and Servicing Agreement (as amended to date, the "TSA") dated as of November 1, 2015 for the Hudson's Bay Simon JV Trust 2015-HBS Commercial Mortgage Pass-Through Certificates, Series 2015-HBS.

**B. Defendants**

23.     Defendant HBC is a corporation organized under the laws of Canada with its principal place of business located in Ontario, Canada.

24.     Defendant Hudson ULC is a corporation organized under the laws of Canada with, upon information and belief, its principal place of business located in Ontario, Canada.

25.     Defendant HBC Bermuda is a limited partnership organized under the laws of Bermuda with, upon information and belief, its principal place of business located in Ontario,

Canada.  Upon information and belief, HBC Bermuda's general partner is HBC GP LLC, a Bermuda LLC formed and controlled by Richard A. Baker, a Canadian citizen.  Upon information and belief, HBC Bermuda's limited partners are: (i) HBSFA Holdings Ltd., a Canadian corporation formed under the laws of British Columbia; (ii) Abu Dhabi Investment Council, the investment arm of the government of Abu Dhabi, with its headquarters in Abu Dhabi, United Arab Emirates; and (iii) two Bermuda limited partnerships through which profits interests and incentive membership units are available to "Management," who, on information and belief, are Canadian citizens.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as this is a suit between a citizen of Delaware and citizens of foreign states, with an amount in controversy that exceeds $75,000.00.  The claims alleged and the relief sought herein arise under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and are brought pursuant to Federal Rules of Civil Procedure 57 and 65.

27.     This Court has personal jurisdiction over HBC and Hudson ULC by virtue of *inter alia* the irrevocable certification of submission to New York exclusive jurisdiction provision in Section 4.1 of the Operating Lease Guarantees, to which HBC is party and to which Hudson ULC purports to be successor following the Take-Private Transaction, which provides in pertinent part: "[e]ach Party hereto irrevocably submits to the exclusive jurisdiction of the state and federal courts of the [*sic*] New York …. [and e]ach " Party … acknowledges that it and the other parties hereto have been induced to enter into this [Operating Lease Guaranty] Agreement, as applicable, by, among other things, the … certifications in this Section 4.1.

28.     This Court has personal jurisdiction over HBC Bermuda by virtue of: (i) its representation in its proffered purported "Assumption Agreement" (discussed below), and in its representation in the May 15th Letter (defined below), that it purports to "assume" the Operating Lease Guaranty and accordingly will submit itself to the exclusive New York jurisdiction over this

matter; and (ii) the coordinated tortious activities of Defendants to create HBC Bermuda, in part, for the removal of assets of HBC, which is subject to agreements with New York exclusive forum selection clauses in connection with its role as guarantor under the Operating Lease Guarantees. Plaintiff's citation to HBC Bermuda's represented voluntary submission to jurisdiction in New York is in no way an acceptance or agreement by Plaintiff that HBC Bermuda is now, or will be, a permitted substitute or additional guarantor under the Operating Lease Guarantees.

29.     Venue in this Court is proper under 28 U.S.C. § 1391 because of the contractual and exclusive forum selection clause set forth in Section 4.1 of the Operating Lease Guarantees.

## FACTUAL ALLEGATIONS

### I.     The Relevant Agreements and Governing Law

30.     The issues in this case are governed by the following contracts (collectively referred to herein as the "Loan Documents"):

(i)     (A) the Guaranty dated as of July 22, 2015 (attached hereto as **Exhibit 1**) by HBC in favor of the L&T Landlord (defined below) (as amended and reaffirmed to date, the "L&T Operating Lease Guaranty"); and (B) the Guaranty dated as of July 22, 2015 (attached hereto as **Exhibit 2**) by HBC in favor of the Saks Landlord (defined below) (as amended and reaffirmed to date, the "Saks Operating Lease Guaranty" and, together with the L&T Operating Lease Guaranty, collectively, the "Operating Lease Guarantees"); the Beneficiaries' interests in which Operating Lease Guarantees were assigned to the Lender pursuant to the Mortgages and the other Loan Documents;

(ii)     (A) the Master Lease (as amended to date, the "L&T Operating Lease") dated as of July 22, 2015 (attached hereto as **Exhibit 3**) between the Individual Borrowers identified therein, as landlord (collectively, the "L&T Landlord") and Lord & Taylor LLC, as tenant (the "L&T Operating Lessee"); and (B) the Master Lease (as amended to date, the "Saks Operating Lease" and, together with the L&T Operating Lease, collectively, the "Operating Leases") dated as of July 22, 2015 (attached hereto as **Exhibit 4**) between the Individual Borrowers identified therein, as landlord (collectively, the "Saks Landlord") and Saks & Company LLC, as tenant (the "Saks Operating Lessee", and, together with the L&T Operating Lessee, collectively, the "Operating Lessees"); the Landlord's interest in

which Operating Leases were assigned to the Lender pursuant to the Mortgages and the other Loan Documents;

(iii)   Mortgages and/or Deeds of Trust dated as of July 22, 2015 by the various Borrowers, which assigned the Operating Leases and the Operating Lease Guarantees to the Lender.  Examples: (A) "Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing" as of July 22, 2015 by LT Fair Oaks LLC ("Grantor") (a L&T Landlord and Borrower) for the benefit of the Lender (attached hereto as **Exhibit 5**); and (B) "Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing" as of July 22, 2015 by Saks Beverly Hills LLC ("Grantor") (a Saks Landlord and Borrower) for the benefit of the Lender (attached hereto as **Exhibit 6**); and

(iv)   the Loan Agreement (as amended to date, "Loan Agreement") dated as of July 22, 2015 (attached hereto as **Exhibit 7**) between the Individual Borrowers party thereto (collectively, "Borrowers"), and the predecessor-in-interest to the Trustee, as trustee in trust for Holders of Hudson's Bay Simon JV Trust 2015-HBS, Commercial Mortgage Pass-Through Certificates, Series 2015-HBS, as lender (the "Lender"), pursuant to which that certain mortgage loan in the original principal amount of $846,229,966 was made by the Lender's predecessor-in-interest to Borrower (the "Loan").

31.   These contracts are governed by New York law:  Operating Lease Guarantees § 4.1 (Compl. Exs. 1, 2) ("This Agreement, and any matter or dispute arising out of or related to this Agreement, shall be governed by, subject to and construed in accordance with the internal laws of the State of New York without regard to its conflicts of law principles . . . ."); Operating Leases § 37.7 (Compl. Exs. 3, 4) ("[T]his Lease and the Obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and performed in such state (without regard to principles of conflicts of laws) . . . ."); and Loan Agreement § 10.3 (Compl. Ex. 7) ("[T]his Agreement, the Note and the other Loan Documents and the Obligations arising hereunder and thereunder shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and performed in such state (without regard to principles of conflicts of laws) . . . .").

## II.   The Loan and Operating Lease Guaranty Structure

32.   On July 22, 2015, JPMorgan Chase Bank, National Association, Bank of America, N.A. and Column Financial, Inc. originated the Loan – an approximately $846.2 million

first-lien mortgage loan to Borrowers, secured by the fee and leasehold interests in 34 retail properties located in 15 states.  Pursuant to the TSA, the Loan was deposited into, transferred, conveyed, and assigned to the Trust as of November 1, 2015.

33.     The Borrowers consist of 34 special purpose entities, whose primary business is the ownership of one of the properties occupied and operated by an Operating Lessee as either a Lord & Taylor store or a Saks Fifth Avenue store.  Lord & Taylor and Saks are key players in the retail clothing industry that sell many high-end luxury goods to different market segments of consumers, and are under the corporate umbrella of Defendant HBC.

34.     The 34 Borrowers are subsidiaries of HBS Global Properties LLC ("HBS Global Properties"), a joint venture between Defendant HBC and non-party Simon Property Group, Inc. ("Simon").  HBS Global Properties also is the guarantor (the "Non-Recourse Guarantor") of certain liabilities of Borrower under the Loan Agreement, pursuant to that certain Guaranty Agreement (the "Borrower's Recourse Liabilities Guaranty") dated as of January 29, 2016 by HBS Global for the benefit of Lender, and as such is subject to a continuing covenant that it "shall maintain a Net Worth of not less than Five Hundred Million and No/100 Dollars ($500,000,000.00)."

35.     In conjunction with the Loan transaction, each Operating Lessee entered into a unitary, 20-year master Operating Lease for its branded stores; 24 of the mortgaged properties operate as Lord & Taylor stores pursuant to the L&T Operating Lease, and 10 of the mortgaged properties operate as Saks stores pursuant to the Saks Operating Lease.

36.     The Borrowers are required to make monthly "Debt Service Payments" under the Loan.  As the Borrowers under the Loan Agreement also are the Landlords under the Operating Leases, the source of cash for the Borrowers to fund these Loan payments is the rent paid by the Operating Lessees that run the stores, whose cash flow in turn is derived from in-store and online sales of the Lord & Taylor or Saks tenants' merchandise.

37.     As originally structured, the Operating Lease Guarantees provide that the Borrowers'/Landlords' ultimate parent, HBC, which was also the ultimate parent of the Operating

Lessees/Tenants, would serve as Guarantor of the payments of the rents.  The Operating Lease Guarantor guaranteed to the applicable Borrowers full and punctual (i) payment of all monetary obligations payable under the Operating Leases by the Operating Lessees and (ii) performance by the Operating Lessees of all the terms, conditions, covenants and agreements to be performed by the Operating Lessees under the Operating Leases.

38.    A "Structural and Collateral Term Sheet" for the Certificates, dated October 19, 2015, described HBC as follows:

> (TSX: HBC) is one of the fastest growing department store retailers in the world … with more than 460 stores and 65,000 employees around the world. In North America, HBC's leading banners include … Lord & Taylor, Saks Fifth Avenue and Saks OFF 5TH ….[HBC] currently has a B1/B+ credit rating from Moody's and S&P. … HBC currently has an approximately $4.1 Canadian billion market capitalization as of September 30, 2015.

39.    HBC itself represented and warranted, in the Operating Lease Guarantees:

> Guarantor is duly formed, validly existing and in good standing under the laws of Canada, and has all corporate or other applicable entity powers required to carry on its business as now conducted.
>
> . . . .
>
> Guarantor has the financial capacity to pay and perform its obligations under this Guaranty.

Operating Lease Guarantees §§ 3.1(a), (e) (Compl. Exs. 1, 2).

40.    Importantly, both Operating Leases at Section 15.1(m)(ii) provide that it shall be an Event of Default thereunder "if, at any time, . . . any material representation or warranty by Guarantor in the Guaranty shall fail to be true and correct in any material respect."  Furthermore, and illustrative of the level of "financial capacity to pay" contemplated to satisfy the continuing representation and warranty, to the extent a "Replacement Guarantor" is permitted under the Operating Leases (under certain circumstances not present here), the Replacement Guarantor must *inter alia* have a "Minimum Net Worth" of "Two Billion Five Hundred Million ($2,500,000,000)"

and a "Minimum Liquidity" of "two hundred percent (200%) of the then current aggregate Fixed Rent."  Operating Leases § 1.1.  (Compl. Exs. 3, 4).  A Replacement Guarantor also cannot be a "Prohibited Person," which is defined to include, among other things: "any Person (A) that is entitled, directly or indirectly, to diplomatic or sovereign immunity; (B) that is not subject to service of process in the jurisdiction of the federal, state and local courts sitting in New York State; … [or] (D) that is identified on the OFAC List …."[2]  (Id.)

41.    In addition to its continuing representations and warranties of valid existence and financial capacity to pay, HBC also expressly agreed in the Operating Lease Guarantees that:

> no assignment of this [Operating Lease Guaranty] Agreement, in whole or in part, by Guarantor, may be made without the prior written consent of Beneficiary, which consent will be granted ***at the sole discretion of Beneficiary*** and ***any assignment in violation of this*** <u>***Section 4.5***</u> ***will be void.***

Operating Lease Guarantees § 4.5 (emphasis added) (Compl. Exs. 1, 2).

42.    As defined in the Operating Lease Guarantees, "Beneficiary" expressly includes "any assignee thereof."  The Operating Lease Guarantees were specifically assigned to the Lender on the same day the Loan Documents were executed, including by Deeds of Trust for each of the 34 properties.  *See, e.g.,* Example Deeds of Trust (Compl. Exs. 5, 6):

- § 1.1(h): irrevocably assigning to Lender: "[a]ll leases (including, without limitation, [the Operating Leases]) . . . and every . . . other agreement relating to such leases . . . or other agreements entered into in connection with such leases . . . and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto . . . and all right, title and interest of Grantor . . .

---

[2] "OFAC List" is defined as "the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by any Governmental Authority from time to time, including, without limitation, trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States."  Operating Leases, § 1.1 (Compl. Exs. 3, 4).

to secure the performance by the lessees of their obligations thereunder . . . .";

- § 1.1(n): irrevocably assigning to Lender: "[a]ll agreements (including, without limitation, that certain Guaranty, dated as of the date hereof, given by Hudson's Bay Company, a Canadian corporation, as guarantor, in favor of Grantor and certain other entities named therein [*i.e.*, the Operating Lease Guarantees])"; and

- § 7.1: providing that upon the occurrence and during the continuance of any Event of Default, "Grantor agrees that Lender may take such action, without notice or demand . . . including, but not limited to, the following actions . . . .: (e) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained . . . in the . . . Loan Documents [including all "documents evidencing or securing the Debt"]; . . . [and] (h) . . . (iv) exercise all rights and powers of Grantor with respect to the Property . . . including, without limitation, the right to . . . demand, sue for, collect and receive all Rents of the Property . . . ."

43.    As a result, while the corporate structures of HBC and Borrower, as well as the structure of the Loan and its securitization through the Trust were complicated, the key credit support for the Loan was not:  the Loan was secured by 34 properties that enjoy 20-year leases by marquee stores, whose full rents for those 20 years were absolutely and unconditionally guaranteed to Lender by the well-capitalized and funded HBC, which both had to maintain its valid existence and financial capacity to satisfy the Operating Lease Guarantees, and also effectively could not be replaced as Guarantor thereunder without Lender's consent.

44.    Because it depends on consumer discretionary spending, the retail clothing industry is highly vulnerable to recessions and other disruptions to the economy.  Having a company with the financial wherewithal of HBC backstopping the Borrowers' tenants' rent obligations substantially reduced the risk that the stores would be forced to close and sales disrupted because they could not pay rent due to periodic economic dislocations.  The leases on these stores serve as collateral for the Loan.  The Operating Lease Guaranty thus protects the cash flows and collateral that serve as the source of the Loan repayment.

45.    Indeed, with a single, absolute and unconditional, multi-billion dollar net worth guarantor of 20-years of rent payments, who is subject to a contractual, exclusive

enforcement venue of New York, Lender bargained for and enjoyed security for the Loan from the operational side of the HBC structure, notwithstanding that its mortgage Loan also was secured by Borrowers' properties.  By the same token, Borrowers benefitted because the operational security provided by HBC's agreement to guaranty the rents under the Operating Leases resulted in a reduced interest rate charged on the Loan to compensate Lender for (what should have been reduced) credit risk.

### III.    Plaintiff Discovers Defendants' Improper Transfers

46.    As opposed to its position as Operating Lease Guarantor, for which HBC bears sole responsibility as the ultimate backstop of the entirety of the Loan, HBC's role as the indirect parent of each of the Borrowers is through HBS Global Properties, which is a joint venture with non-party Simon.  Thus, if Lender ultimately was to call on its absolute and unconditional Operating Lease Guarantees to repay the Loan, the liability would be 100% with HBC; if, on the other hand, there are no assets left at HBC (*i.e.*, as a result of the Improper Transfers) and Lender, in the event of default, was effectively forced to seek repayment by recourse to 34 Properties in 15 different states, and/or from (in limited circumstances, and potentially subject to a cap) the Non-Recourse Guarantor, HBC's liability would be materially offset and shared by its minority partners in HBS Global Properties.

47.    This structure gives rise to conflicting interests on the part of HBC's controlling shareholders.  In particular, these shareholders are incentivized to shield HBC's assets from exposure to any financial distress at the Borrower level, and instead to shift the risk and negative economic consequences of the tenants' non-payment of rent to the greatest extent possible to minority partners of its joint venture Non-Recourse Guarantor and to Lender, notwithstanding the contractual protections the Lender bargained for surrounding its ultimate guarantor.

48.    That is exactly what happened here.  It is now apparent that the shareholders in control of HBC embarked on a surreptitious restructuring that allowed them to remove assets from HBC and thus the Operating Lease Guarantees, thereby leaving Lender without its bargained-for support if the tenants became unable to pay their rent.  HBC concealed this restructuring from

Lender until it had become a fait accompli.  As explained below, these Improper Transfers violated the Loan Documents and are invalid.

49.     Beginning almost a year prior to this – and well before COVID-19 was apparent – HBC and its affiliates repeatedly attempted to re-trade on the financial terms of the Loan.  While it is not uncommon for commercial lenders to agree to loan modifications by way of a loan workout in lieu of foreclosing on a distressed borrower that cannot repay, that is not what HBC was seeking.  The Borrowers were in good financial condition at that time and were fully-performing their obligations under the Loan.

50.     Moreover, HBC reaffirmed the Operating Lease Guarantees in November 2019.  Specifically, in September 2019, the Borrower advised Lender that it was selling the Lord & Taylor Operating Lessee to Le Tote, Inc.  As part of that sale, HBC:  (i) expressly reaffirmed its obligations under both Operating Lease Guarantees; (ii) affirmatively represented that the sale would not constitute a default under the Operating Lease, the "Ground Lease" or the "Reciprocal Easement Agreements"; and (iii) affirmed that the Individual Properties would continue to be operated in accordance with the Loan Agreement.  That corporate action stands in stark contrast to Defendants' actions in connection with the undercover Improper Transfers consummated just a few months later.

51.     In apparent further misdirection, in January 2020, HBC and its affiliates claimed to be considering a proposal to pay down the Loan.   Discussions were held about various repayment scenarios, including collateral release and requests for waivers of the Loan's yield maintenance premium.  In February 2020, and at the request of Borrower, the Servicer prepared and delivered a proposed prepayment agreement.  While Borrower's counsel subsequently advised that it would not be consummating a prepayment simultaneously with the closing of the HBC Take-Private Transaction, which, according to press reports, was completed with HBC's removal from the Toronto Stock Exchange on March 3, 2020, no indication whatsoever was given that HBC was engaged in related follow-on, private "internal restructurings" that would effectively nullify the Operating Lease Guarantees.

52.     On April 1, 2020, and without prior notice, despite having recently been engaged in potential prepayment discussions, Ian Putnam, HBC's President Real Estate and Chief Development Officer, sent a letter on behalf of the Borrowers (the "April 1st Letter") advising the Servicer that the Borrowers would not make the Debt Service Payment due on April 1 because the rent due under the Leases had not been paid.

53.     At that time, HBC did not fund the rent shortfall as required under the Operating Lease Guarantees.  Nor did it give any prior notice of the Borrowers' impending payment default or disclose whether it had the willingness and financial means to honor its obligations under those guarantees.  Instead, HBC requested on behalf of the Borrowers a four-month deferral of Debt Service Payments.  HBC offered no consideration to the Lender for such forbearance.

54.     While reserving all rights, in response to Putnam's April 1st Letter, the Lender sent the Borrowers the Proposed PNA.  After negotiating terms and exchanging several versions, and just when Plaintiff thought it had agreement on an execution copy and was ready for signing, the Borrowers' counsel advised – with no explanation – that the signature block for HBC, as guarantor under the critical Operating Lease Guarantees, would have to be revised to reflect a different entity.

55.     This disclosure shocked the Lender.  Plaintiff immediately demanded more information about why the identity of the Guarantor had purportedly changed.  On April 17, 2020, Borrowers' counsel responded and advised by email (the "April 17th Representation") that:

> .  .  .  following the consummation of the take-private transaction involving Hudson's Bay Company, certain internal restructuring transactions were consummated. Following this restructuring, the pre-reorganization ultimate parent entity, Hudson's Bay Company, is an entity called Hudson's Bay Company ULC. … A newly formed Bermuda entity, HBC L.P., indirectly owns 100% of Hudson's Bay Company ULC, and holds all of the assets and liabilities that were held by Hudson's Bay Company immediately prior to the closing.

This April 17th Representation was the first time any hint of the Improper Transfers was disclosed to Lender by the Borrowers or any related party (including Defendants).

56.     This informal purported explanation of the Improper Transfers provided no transparency or comfort to Lender.  To the contrary, it set off alarm bells.  As it appears from the April 17th Representation, the Improper Transfers resulted in Hudson ULC becoming the legal successor to HBC ("Following this restructuring, the pre-reorganization ultimate parent entity, Hudson's Bay Company, is an entity called Hudson's Bay Company ULC.").  In addition, the April 17th Representation nonchalantly advised the Lender that its bargained-for, ultimate guarantor of its $850 million Loan no longer existed, and apparently had been succeeded instead by an empty shell, because the Improper Transfers upstreamed "all of the assets and liabilities" from HBC – a critical economic backstop for payment of, among other things, rent under the Leases and, consequently, for Debt Service — to a newly formed foreign entity, HBC Bermuda.  This new entity is under the control of HBC's controlling shareholders.

57.     The April 17th Representation made clear that Defendants were purporting to foist upon Lender:  (i) a purported successor to HBC that had been stripped of all assets; and (ii) an offshore entity with entirely unknown total assets and liabilities, and a questionable (if any) obligation to satisfy the Operating Lease Guarantees.  No doubt, Defendants deliberately hid the Improper Transfers from Lender so that they could scramble the eggs without Plaintiff having its contractually mandated opportunity to understand in advance, determine whether to consent, and/or, if necessary, challenge any proposed transaction not in compliance with the Loan Documents.   Defendants' tactical decision to consummate transformative corporate reorganizations with respect to Lender's Operating Lease Guarantor without notice or consent does violence to the Lender's bargained-for, and express contractual Operating Lease Guaranty protection rights.

## IV.     Defendants' Improper Transfers Violate the Loan Documents

58.     The Improper Transfers violated the Operating Lease Guarantees, which provide, at Section 4.5, that "no assignment of this Agreement, in whole or in part, by Guarantor,

may be made without the prior written consent" of the Lender and that "any assignment in violation of this Section 4.5 will be void."  (Compl. Exs. 1, 2.)  To the extent that the April 17th Representation is read as a purported notice that the Operating Lease Guarantees were assigned to and assumed by HBC Bermuda ("[a] newly formed Bermuda entity, HBC L.P. . . . holds all of the assets and liabilities that were held by Hudson's Bay Company immediately prior to the closing."), Defendants did not even ask for, let alone obtain, the requisite consent.

59.     Moreover, the transfer, as part of the Improper Transfers, of HBC's stock to HBC Bermuda, as well as the transfer of HBC's indirect ownership interests in the Borrowers, constitute "Transfers" under Section 5.2.10 of the Loan Agreement, which provides:

> *Without the prior written consent of Lender*, which consent shall not be unreasonably withheld, conditioned or delayed, and except to the extent otherwise set forth in this Section 5.2.10, Borrower shall not, and *shall not permit any Restricted Party* to do any of the following (collectively, a "Transfer"): . . . (ii) permit a Sale or Pledge of an interest in any Restricted Party, other than Permitted Transfers.

(Compl. Ex. 7 (emphasis added).)

60.     "Restricted Party" under the Loan Agreement includes: "(a) Borrower, …and [Non-Recourse] Guarantor and (b) any shareholder, partner, member, non-member manager, any direct or indirect legal or beneficial owner of, Borrower, [Non-Recourse] Guarantor … or any non-member manager …" *i.e.,* HBC.  (Compl. Ex. 7.)

61.     Based on the (minimal) information provided by Defendants, the Improper Transfers are not Permitted Transfers, and thus could not be consummated without Lender's prior written consent, which was not obtained.

62.     In the April 17th Representation, counsel for Borrower affirmed, in conclusory fashion: "All transfers in connection with the take-private and subsequent restructuring were performed in compliance with applicable loan document provisions, as the borrowers continue to be owned at least 20% indirectly, and Controlled, by HBC [Bermuda]."  While

providing no details, or even any reference to a specific provision of the Loan Agreement, it appears that Defendants are purporting to rely on Section 5.2.10(d)(vi) of the Loan Agreement[3], which provides, in relevant part, that a Permitted Transfer includes:

> [T]he Transfer of any indirect equity interests in Borrower . . . provided that following any such Transfer a Qualified Transferee (x) owns at least twenty percent (20%) of the direct or indirect equity interests in Borrower and Controls Borrower, (y) [the Non-Recourse Guarantor HBS Global Properties] shall reaffirm its obligations under the [Borrower's Recourse Liabilities] Guaranty and the Environmental Indemnity or delivers to Lender a Substitute Guaranty and Substitute Environmental Indemnity Agreement from a Replacement Guarantor and (z) is, or is Affiliated with, a Person that is actively engaged in owning or operating commercial retail properties similar to the Properties . . . .

(Compl. Ex. 7.)

63.     Although the April 17th Representation refers (in substance) to subsection (x) of Section 5.2.10(d)(vi), it omits any reference to the fact that in order to be a Permitted Transfer, the Transfer must be made to a "Qualified Transferee." Defendants have failed and refused to provide any explanation as to why HBC Bermuda might be a Qualified Transferee.

64.     To the contrary, the Loan Agreement defines "Qualified Transferee" as:

> any of the following: (i) any bank, savings and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund, pension advisory firm, mutual fund, government entity or plan, real estate company, real estate investment trust, investment fund or institution substantially similar to any of the foregoing, provided in each case that such institution (A) satisfies the Transferee Eligibility Requirements, and (B) is actively engaged in owning or operating commercial retail properties; (ii) any Person (A) which satisfies the Transferee Eligibility Requirements, (B) whose identity, financial condition and creditworthiness, including net worth and liquidity, is

---

[3] Plaintiff assumes that Defendants are not purporting to rely on Section 5.2.10(d)(i) of the Loan Agreement, which also references a 20% continuing direct or indirect ownership interest in Borrower, but by HBC (which supposedly no longer exists).  Given that the April 17th Representation avers that all of HBC's assets were removed to HBC Bermuda, which is a newly formed entity and not even the supposed legal successor to HBC (because that supposedly is Hudson ULC), the provision cannot apply.

reasonably acceptable to Lender, and which has been otherwise approved by Lender in its reasonable discretion, and (C) with respect to which a Rating Agency Confirmation has been delivered to Lender, or (iii) any Affiliate at least fifty percent (50%) owned and Controlled by any Person <u>in clauses (i)</u> or <u>(ii)</u> above.

(Compl. Ex. 7 at pp. 30-31.)

65.     To the extent that HBC Bermuda even meets the threshold requirements of subsection (i) (it certainly has not satisfied (ii), given that Lender did not approve the purported Transferee), HBC Bermuda has not even attempted to demonstrate that it satisfies the Transferee Eligibility Requirements applicable to subsections (i), (ii), and (iii).   "Transferee Eligibility Requirements" means that the person "(i) has total assets . . . in excess of $1,500,000,000 (exclusive of the Properties) and . . . capital/statutory surplus or shareholder's equity of at least $750,000,000 (exclusive of the Properties)."  (Compl. Ex. 7.)  Defendants have blatantly ignored all requests for any financial information relating to HBC Bermuda.

66.     Furthermore, even if HBC Bermuda could qualify as a Qualified Transferee, the diversion to it of all of HBC's assets still would not be a Permitted Transfer.  The April 17th Representation omits any reference to the requirement of subsection (y) of Section 5.2.10(d)(vi) of the Loan Agreement regarding the reaffirmation by the Non-Recourse Guarantor of its obligations under its Guaranty.  The failures to provide the reaffirmations required under Section 5.2.10(d)(y) constitute independent breaches of the Loan Agreement.  (Compl. Ex. 7.)

67.     It is unclear whether Defendants even advised HBC's joint venture partner in HBS Global Properties as to the fact that Defendants were consummating corporate transactions that – if permitted at all – triggered material obligations of HBS Global Properties, and/or exposed HBS Global Properties and its minority investors to liability for damages to the extent the Improper Transfers constitute "wilfull misconduct of any Individual Borrower or Guarantor in connection with the Loan" pursuant to Section 9.3(b)(ii) of the Loan Agreement, and/or violate Section 9.3(c)(B)(3) of the Loan Agreement, for any Borrower's "fail[ure] to obtain Lender's prior written consent to any Transfer as required by this Agreement."

68.     In addition to Defendants' failure to establish a Permitted Transfer and failure to obtain Lender's consent, the failure to provide advance notice of the Improper Transfers itself constitutes an independent breach of the Loan Agreement.  Section 5.2.10(e) of the Loan Agreement requires as a condition to *any* Transfer[4] that Lender shall receive not less than 10 business days prior written notice of such proposed Transfer and an updated organizational chart which shows the new proposed ownership structure of Borrower.  (Compl. Ex. 7.)

69.     Section 5.2.10(e) also requires delivery to Lender of a non-consolidation opinion letter reasonably acceptable to Lender, and to the Rating Agencies of the securitization, as well as "Know Your Customer" ("KYC") documentation satisfactory to Lender, if "after giving effect to any Transfer (including a Permitted Transfer), more than forty-nine percent (49%) in the aggregate of direct or indirect interests in a Restricted Party are owned by any Person and its Affiliates that owned less than forty-nine percent (49%) direct or indirect interest in such Restricted Party as of the Closing Date [of the Loan]."  (Id.)

70.     According to the April 17th Representation, following consummation of the Improper Transfers, "[a] newly formed Bermuda entity, HBC L.P., indirectly owns 100% of Hudson's Bay Company ULC." As a "newly formed Bermuda entity," HBC Bermuda owned nothing as of the Closing Date, but now purportedly "owns 100%" of the purported successor to HBC.  The provisions of 5.2.10(e) therefore were breached by the failure to provide advance notice to Lender of the Improper Transfers, and by the failure to deliver the requisite non-consolidation opinion letter and KYC documentation.

71.     This prior notice and the other requirements of Section 5.2.10(e) of the Loan Agreement are a material aspect of the credit structure, permitting Lender time and information to challenge any proposed Transfer apparently inconsistent with the Loan Documents.  Of course, such prior notice, which was never delivered, would have provided Lender with just such an opportunity to assess the Improper Transfers and/or any other proposed Transfer before they were

---

[4] *Including* a "Permitted Transfer," except in two cases inapplicable to the Improper Transfers.

consummated and, if not consistent with the Loan Documents, to challenge it and/or withhold consent, as applicable.

72.     Furthermore, while the obligation under the Loan Agreement lies with the Borrower not to "permit" any Restricted Party to make a Transfer that does not comply with these provisions, given *inter alia* that Borrower communications to Lender have come on the letterhead of Putnam at HBC, that HBC was in control of the Improper Transfers, and that HBC was the ultimate parent of Borrower, HBC – knowing full well of the Borrower's obligations under the Loan Agreement – caused the Borrower to breach its obligation to prevent the Improper Transfers without providing to Plaintiff its contractually requisite notice, information, and opportunity to consent and/or challenge the Improper Transfers.

73.     The failure here to seek Lender's consent and/or provide Lender notice was deliberate.  Defendants intentionally concealed the Improper Transfers from Lender because they knew how critical HBC's financial backstop was to the entire Loan transaction, and knew that Lender would never consent to the Guarantor on the Operating Lease Guarantees being rendered an empty shell, or accepting instead a newly formed, offshore entity without *inter alia* any transparency whatsoever as to its total assets and liabilities.

## V.     Defendants Further Confirm the Violative Transfers

74.     By letter dated April 24, 2020 (the "April 24th Letter") (attached hereto as **Exhibit 8**), the Servicer advised HBC that it believed the Improper Transfers amounted to numerous, serious violations of the Loan Documents.  The Servicer further requested additional information to permit it to evaluate the impact of the Improper Transfers, including the relationship between Hudson ULC and HBC Bermuda, and the financial status of both companies.  Among other things, the Servicer specifically requested:

    (i)      documents sufficient, in Lender's judgment, to evidence the structure and documentation of both the HBC Take-Private Transaction and the Improper Transfers;

    (ii)     all valuations of the Operating Lease Guarantor and/or its affiliates, joint ventures and the identity of and valuations of any purported

successors to any of its assets (both prior to and following the consummation of the HBC Take-Private Transaction and the Improper Transfers);

(iii)    all internal valuations and analyses of the net worth, assets and liquidity of HBC and/or any purported successor to HBC, prior to and following the consummation of the HBC Take-Private Transaction and the Improper Transfers;

(iv)    documents sufficient, in Lender's judgment, to evidence the use or disbursement of any funds, in a single or multiple transfers to a Person or its affiliates, over $1,000,000 by any purported successor to HBC; and

(v)    documents sufficient, in Lender's judgment, to evidence the effect of the HBC Take-Private Transaction and the Improper Transfers (including any other purported Transfers) on all Restricted Parties and their affiliates, including, without limitation, copies of before and after organizational charts, and before and after net worth statements of the Operating Lease Guarantor, the Non-Recourse Guarantor, and any of their purported successors.

These requests were expressly made without prejudice, without any agreement as to the permissibility under the Loan Agreement or otherwise of the Improper Transfers and/or any other purported Transfers, and subject to an express reservation of all of Lender's rights.  (Compl. Ex. 8.)

75.    On April 28, 2020, Putnam, on HBC letterhead on behalf of Borrower, provided a three-paragraph (plus reservations of rights) letter (the "April 28th Letter") (attached hereto as **Exhibit 9**) in response to Plaintiff's 12-page April 24th Letter.  The April 28th Letter put forward cursory and conclusory denials of wrongdoing, asserted that portions of the April 24th Letter expressing Lender's serious concerns were simply "irrelevant," and enclosed a purported "Assumption Agreement," whereby HBC Bermuda professed to assume the obligations under the Operating Lease Guarantees.  (Compl. Ex. 9.)  Defendants' belated attempt to paper over the Improper Transfers is a tacit admission that their actions were improper.

76.    Furthermore, Defendants have provided almost no additional information about the Improper Transfers, the transfers of HBC's assets, and the financial status of Hudson ULC and HBC Bermuda.  Accordingly, the Purported Assumption does not remedy Defendants'

breaches of the Loan Documents and other wrongdoing, and is still completely devoid of any meaningful information requested by Plaintiff (indeed, required by the Loan Documents) to even begin to consider HBC Bermuda as a possible replacement guarantor under the Operating Lease Guarantees.

77.     In a further apparent attempt to deflect attention from Plaintiff's demands for information concerning the Improper Transfers, on April 30, 2020, Putnam, again on HBC letterhead on behalf of Borrower, sent another letter (the "April 30th Letter") proposing: (i) a six month extension of the Maturity Date of Component A of the Loan until February 1, 2020; (ii) forbearance with respect to April, May and June 2020 Debt Service (with payments to recommence July 1); and (iii) that Borrower would continue to pay all Taxes and Insurance Premiums during the proposed forbearance period.  While the April 30th Letter claimed that HBC understood that any Loan restructuring would require the investment of additional equity by Borrower, and professed a purported "commit[ment] to preserving" collateral, that claim was belied by the fact that Putnam yet again dismissed Plaintiff's expressed concerns about Defendants' apparent numerous and serious breaches of the Loan Documents, and made clear that Defendants had no intention of complying with Plaintiff's requests for transparency, stating instead simply that "we would like to cut through the distraction of the legal back and forth…."

78.     On May 1, 2020, the Servicer sent another letter (the "May 1st Letter") (attached hereto as **Exhibit 10**), renewing its detailed information requests, and confirming that the continued failure and refusal to respond thereto precluded any ability of Lender to evaluate or reevaluate its significant concerns and positions as set forth in the April 24th Letter.

79.     On May 5, 2020, HBC's Putnam sent another letter (the "May 5th Letter") (attached hereto as **Exhibit 11**) on behalf of Borrower in purported response to Plaintiff's April 24th Letter and the May 1st Letter.  The again cursory response was not much more than a cover letter, identifying enclosures that included past due and still incomplete financial reporting required under the Loan Agreement.  In addition, and supposedly in response to Plaintiff's substantive and detailed information requests surrounding the HBC Take-Private Transaction and

follow-on Improper Transfers, Putnam enclosed "(i) the Offering Circular with respect to the take-private transaction and (ii) a steps deck prepared by Deloitte [(the "Draft Transaction Structure Deck" or "DTS Deck")] with respect to the restructuring."  (Compl. Ex. 11 (enclosures omitted).)

80.     This purported response to Plaintiff's revelation of Defendants' deliberate corporate maneuvers that stripped, and terminated the existence of, the Operating Lease Guarantor, and to Plaintiff's repeated good faith requests for detailed information to understand what happened to its Guarantor, confirmed Plaintiff's worst fears about HBC and its intentions with respect to honoring the clear and unambiguous terms of the Loan Documents negotiated to protect Lender in its $850 million credit extension.

81.     As a preliminary matter, the 32-slide DTS Deck provided **_no_** meaningful information about the Improper Transfers, because it was clearly legended, on every single slide: "Draft │For Discussion Purposes Only" and "This written communication is solely for [HBC's] benefit, and is not to be relied upon by any other person or entity."  Beyond being marked "Draft," the DTS Deck was dated March 2, 2020.  The May 5th Letter did not even purport to claim that the DTS Deck represented the final structure of the consummated Improper Transfers.  (Compl. Ex. 11.)

82.     Further, if it were not already implied from the cursory, April 17th Representation's description of HBC being transformed into Hudson ULC, and an entirely new Bermuda entity being formed that took over HBC assets, the DTS Deck reflects a series of intertwined and extremely complex transactions – including the HBC Take-Private Transaction – that apparently all took place since December 6, 2019 (conveniently following HBC's reaffirmation to Lender of the Operating Lease Guarantees).  Rather than answering any of Lender's requests, the DTS Deck further evidences the urgent need for expedited discovery and judicial intervention to determine the status of the Operating Lease Guarantor and Lender's rights in connection therewith.

83.     The "draft" information provided in the DTS Deck also does not shed any light on how the Improper Transfers were undertaken supposedly in compliance with the Loan

Documents.  The DTS Deck further included a number of items that are blank or bracketed, and several steps that were "intentionally omitted."  Plaintiff thus has no way of knowing, based on this deck, whether any or all of the transactions purportedly described therein have occurred or will occur, or on what terms.

84.  On May 15, 2020, Putnam delivered to Plaintiff a single-page cover letter on behalf of HBC (the "Cover Letter"), enclosing a Loan Modification Proposal by Borrower (the "May 15th Letter") (attached hereto as **Exhibit 12**).  In addition to recounting the recent effects of the COVID-19 crisis on retailers, the Cover Letter claimed: "[a]t HBC, our single-minded focus has been on protecting the master lease guarantor with respect to your collateral and ensuring its survival."  The words stand in stark juxtaposition to HBC's actions, however, given that the Cover Letter and May 15th Letter comprise yet another communication by Putnam which entirely ignores Plaintiff's requests, set forth in the Servicer's April 24th Letter, for specific and detailed information concerning, *inter alia*: (i) the asset-stripping and dissolution of its Operating Lease Guarantor; (ii) transparency concerning the Take-Private Transaction and related Improper Transfers; (iii) financial information concerning any purported successor to, assignee of, or proposed joint guarantor for HBC; and (iv) how any of the foregoing purportedly was in compliance with the Loan Documents.

85.  As with the previously proffered Assumption Agreement, the single-paragraph, summary purported description regarding the Operating Lease Guarantor is an effective "pay no attention to that man behind the curtain" directive.  The May 15th Letter proclaims that:

> Prior to the closing of the take private transaction, Hudson's Bay Company, the Canadian public company, was the sole Operating Lease Guarantor.  As part of the take private transaction, driven entirely by tax considerations, we undertook a reorganization pursuant to which HBC [Bermuda] became the ultimate parent company holding all of the assets of Hudson's Bay Company, the former public company, other than the cash used to redeem the public equity holders. Also as part of the reorganization, Hudson's Bay Company converted to become Hudson's Bay Company ULC (an unlimited liability company). While Hudson's Bay Company ULC continues as a guarantor under the Operating Lease, to ensure

> that the Operating Lease Guaranty provides the same benefit as it did prior to the take private transaction, HBC [Bermuda] has also assumed all Operating Lease Guaranty obligations of Hudson's Bay Company under the Operating Lease.  HBC will make ourselves available to walk you through the reorganization and answer any questions you may have.

The admission is stunning.  Just as they blatantly ignored Plaintiff's clear and unambiguous contractual rights to advance notice and consent, Defendants blithely pronounce that they have inserted an entirely new foreign entity as a purported joint guarantor, while failing even to acknowledge Plaintiff's continued demands for specific information – including but not limited to requisite financial, shareholder identity, non-consolidation and KYC information – about any supposed successor or assuming guarantor.  To be clear: (i) Plaintiff continues to lack any meaningful, actual information to evaluate a proposed addition of HBC Bermuda as joint guarantor; (ii) Plaintiff has not accepted any change to what should have been its contractually-protected guarantor identity; and (iii) more importantly, Defendants simply do not have the right to deliberately and secretly violate the contractual restrictions on such corporate maneuvers and then, when caught, declare it to be all fine.

86.     Plaintiff still has no meaningful visibility into the Improper Transfers, how they supposedly complied with the Loan Documents, and their impact on the creditworthiness of HBC or its purported successor(s), and thus whether any entity can meet, among other things, the continuing representations and warranties concerning the financial wherewithal of the Operating Lease Guarantor to unconditionally and absolutely guarantee all payments under the 20-year Operating Leases, that would fully (ultimately) pay back the Loan.  Similarly, and again notwithstanding HBC's conclusory assertions otherwise, Plaintiff has no visibility into (among other things) whether the removal of assets from and dissolution of HBC has impacted the Non-Recourse Guarantor's Net Worth covenant.

87.     Defendants' actions continue to belie their words of assurance.  While Putnam: (i) professed in his April 28th Letter a "commitment to protect the ground leased Loan

collateral"; (ii) asserted in his May 5th Letter that "[e]vidence of our payment of Ground Rent . . . will be forthcoming"; and (iii) in the Cover Letter to the May 15th Letter, professed a "single-minded focus" on protecting Lender's collateral, on May 8, 2020, Plaintiff received a copy of notice of a Ground Lease default that had been addressed to *inter alia* HBC. The Servicer subsequently was able to obtain confirmation directly from that Ground Lessor that, in apparent response to the notice of default, it thereafter received a check in respect of April and May Ground Lease payments, but the Servicer is still working to confirm that all other collateral of the Loan is being protected. The occurrence of a ground lease default in a commercial real estate transaction of this size is rare and alarming. The fact that HBC allowed a Ground Lease to go into default further illustrates Defendants' (lack of) respect for their contractual obligations, and further underscores the urgency of the relief Plaintiff seeks.

### VI.    The Harm to Lender

88.    Because the Improper Transfers were accomplished in violation of the notice, consent, and other substantive terms of the Loan Documents, Lender has been deliberately deprived of the benefit of its bargain, and faces continuing risk of irreparable harm. This is particularly so, given that in light of the recent economic impacts in this country of Covid-19 – all of which post-date Defendants' undertaking of their covert corporate shell game – recent press reports signal an intention on the part of Lord & Taylor to liquidate inventory in its stores upon their reopening, while other reports suggest stores may never reopen. At the same time, still other press reports imply efforts to propose a merger between Saks and the now-bankrupt Neiman Marcus. There is clearly no more critical time for Plaintiff to understand its position and rights vis-à-vis the entity that promised to fully backstop the rent payments of those stores under the Operating Leases, and to "press pause" before any assets that were transferred in violation of the Loan Documents are used to consummate new ventures outside of the Loan structure.

89.    Accordingly, Plaintiff seeks limited injunctive relief that maintains the status quo during the pendency of this matter by prohibiting Defendant HBC Bermuda from engaging in further restructuring transfers, assignments, or dissipation of assets obtained as a result

of the Improper Transfers.  Plaintiff requests such relief noting the irony of having to seek urgent court intervention simply to maintain the "status quo," when what Plaintiff was actually entitled to under the Loan Documents is the status quo ante, before the consummation of the Improper Transfers.

90.     Plaintiff further seeks expedited discovery with regard to information and documentation relating to and/or created within the period June 1, 2019 through present, regarding the HBC Take-Private Transaction and the related Improper Transfers, relating directly or indirectly to the collateral and/or assets that directly or indirectly supported the Loan prior to and following the consummation of the HBC Take-Private Transaction and the Improper Transfers.

91.     Finally, Plaintiff seeks a declaratory judgment that the Improper Transfers violated the Loan Documents and thus are void, and seeks attorneys' fees and costs, and such other relief as the Court finds appropriate.

### FIRST CAUSE OF ACTION
### For Declaratory Judgment
### (Breach of Loan Documents)

92.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 91 above as if set forth more fully herein.

93.     The Loan Documents are valid and enforceable agreements.

94.     HBC was the Guarantor under the Operating Lease Guarantees, which guaranteed the underlying tenants' payment of rent, ground rent, taxes, and other payments.

95.     The payments guaranteed under the Operating Lease Guarantees are used to make payments on the Loan's Debt Service, pay real estate taxes, make ground lease payments, and other critical items in order to preserve the Lender's security and interest in the Loan.

96.     The Operating Lease Guarantees, and HBC's absolute and unconditional guaranty thereunder, were a material inducement to Lender to make the nearly $850 million Loan.

97.     The Operating Lease Guarantees, in Section 4.5, prohibited HBC from assigning all or a part of its guarantor obligations without Lender's consent.

98.     The Operating Lease Guarantees, in Sections 3.1(a) and (e), together with the Operating Leases, in Section 15.1(m), require that HBC continue to be "validly existing" with "the financial capacity to pay and perform its obligations under this Guaranty."

99.     Under the Loan Agreement Section 1.1, HBC (along with Borrowers and the Non-Recourse Guarantor HBS Global Properties) is a "Restricted Party."

100.    The Loan Agreement Section 5.2.10(b) and (c) defined as "Transfers": a "Sale or Pledge of an interest in any Restricted Party" or "any merger, consolidation or Sale or Pledge of [the Restricted Party's] stock."

101.    The Loan Agreement Section 5.2.10 prohibits most Transfers without the consent of Lender.

102.    The Loan Agreement Section 5.2.10(d)(vi) provides that some Transfers may be Permitted Transfers.

103.    However, even for those Transfers that qualify as "Permitted Transfers," the Lender must receive advance notice.

104.    Moreover, pursuant to the Loan Agreement Section 1.1, to be a Permitted Transfer, the Transfer must be made to a "Qualified Transferee."

105.    Defendants neither provided the required notice to Plaintiff nor established that HBC ULC or HBC Bermuda were Qualified Transferees.

106.    Only after Plaintiff's fortuitous discovery did Defendants admit to engaging in the Improper Transfers that resulted in the termination of HBC and the new formation of Hudson ULC and HBC Bermuda.

107.    Defendants' belated attempt to put forward the purported Assumption Agreement for HBC Bermuda does not cure the numerous breaches of the Loan Documents caused by Defendants.

108.    Lender's contractual right to know, and to be assured of the maintenance of the identity of its ultimate guarantor under the Operating Lease Guarantees, is a critical component of the structure of the nearly $850 million Loan and a material inducement for Lender to lend.

109.    Defendants have steadfastly refused to provide any meaningful information sufficient to ascertain what happened to HBC and its assets, and have provided no transparency as to: (i) the creditworthiness of any purported successor or "assuming" Guarantor under the Operating Lease Guarantees; and (ii) whether the Improper Transfers have also impacted the creditworthiness of the Non-Recourse Guarantor.

110.    By engaging in the Improper Transfers, Defendants have violated the Operating Lease Guarantees and the other Loan Documents and caused irreparable harm to Lender.

111.    Because this is a justiciable controversy, Plaintiff is entitled to a declaration that:

(i)     Defendants' transfers, assignments, and dissipation of HBC's assets that occurred in connection with the HBC Take-Private Transaction and the related Improper Transfers violated the Loan Documents, including but not limited to the provisions of the Loan Agreement and the Operating Lease Guarantees set forth above; and

(ii)    The Improper Transfers are void.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays for the following relief against Defendants:

A.      Declaratory Judgment that the Improper Transfers violated the Loan Documents and are void;

B.      A temporary restraining order and preliminary injunction requiring Defendant HBC Bermuda to maintain the status quo during the pendency of this litigation by prohibiting it from engaging in further restructuring transfers, assignments, or dissipation of assets transferred to it in violation of the Loan Documents;

C.      An order expediting discovery with regard to information and documentation relating to and/or created within the period June 1, 2019

through present, regarding the HBC Take-Private Transaction and the related Improper Transfers, relating directly or indirectly to the collateral and/or assets that directly or indirectly supported the Loan prior to and following the consummation of the HBC Take-Private Transaction and the related Improper Transfers;

D.    An award of the costs and expenses incurred in this litigation, including attorneys' fees ( including pursuant to the Loan Documents); and

E.    Any such other and further relief as the Court may deem just and proper.

Dated: May 17, 2020            **LOWENSTEIN SANDLER LLP**

By:    */s/ Michael T.G. Long*
Michael T.G. Long
Sheila A. Sadighi (*pro hac vice forthcoming*)
Thomas E. Redburn, Jr. (*pro hac vice forthcoming*)
1251 Avenue of the Americas
New York, New York 10020
Tel. 212.262.6700
mlong@lowenstein.com
ssadighi@lowenstein.com
tredburn@lowenstein.com

and

**FRANDZEL ROBINS BLOOM & CSATO, L.C.**
Craig A. Welin *(pro hac vice forthcoming)*
1000 Wilshire Boulevard, 19th Floor
Los Angeles, CA  90017-2427
Tel. (323) 852-1000
cwelin@frandzel.com

*Counsel for Plaintiff*

## VERIFICATION

ROBERT RECORDS, of full age, hereby declares as follows:

1.      I am a Director – Special Servicing at Situs.

2.      I hereby certify under penalty of perjury that the foregoing factual statements made in the Verified Complaint are true and correct to the best of my knowledge, information, and belief and that I have reviewed the Verified Complaint and concur with its filing.


Dated:  May 17, 2020                    _____

                                                            Robert Records