UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

WILMINGTON TRUST, NATIONAL
ASSOCIATION, AS TRUSTEE FOR THE
BENEFIT OF THE HOLDERS OF
HUDSON'S BAY SIMON JV TRUST 2015-
HBS, COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES 2015-
HBS, BY SITUS HOLDINGS, LLC, IN ITS
CAPACITY AS SPECIAL SERVICER,

                Plaintiff,

             - against -

HUDSON'S BAY COMPANY, HUDSON'S
BAY COMPANY ULC, AND HBC L.P.,

             Defendants.

------------------------------------------------------------ x

1:20-cv-03830 (GHW)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S  ORDER TO SHOW CAUSE

**WILLKIE FARR & GALLAGHER LLP**
Tariq Mundiya
Jeffrey B. Korn
Randall W. Jackson
787 Seventh Avenue
New York, NY 10019

*Attorneys for Defendants Hudson's Bay Company*
*ULC (f/k/a Hudson's Bay Company) and HBC L.P.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 4

    A.    None Of The Loan Documents Restricts HBC From Conducting An Internal Restructuring Of Its Corporate Group. ......................................... 4

    B.    HBC Continues To Exist Following A Name Change With More Than Sufficient Assets To Satisfy Its Obligations Under The Operating Lease Guarantees—Which Were Never Assigned To Anyone. ....................................... 8

    C.    The Impact of the COVID-19 Pandemic. ........................................................... 11

    D.    Plaintiff's Lawsuit ................................................................................................. 12

ARGUMENT ............................................................................................................................ 14

I.    PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS ............................... 15

    A.    This Case Should Be Dismissed Pursuant To Fed. R. Civ. P. 19 Because Borrowers—The Actual Parties To The Loan Agreement—Are Not Defendants In This Case. ........................................................................................ 15

    B.    Defendants Did Not Breach The Operating Lease Guarantees. ........................... 17

    C.    Defendants Are Not Parties To The Loan Agreement And, In Any Event, Transfers By HBC In An Internal Restructuring That Left The Collateral Completely Intact Are Permitted. ......................................................................... 18

II.    PLAINTIFF HAS NOT DEMONSTRATED THAT IT WILL SUFFER IRREPARABLE HARM ABSENT THE FREEZING ORDER IT SEEKS. .................... 21

III.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY AGAINST FREEZING ASSETS THAT HBC BERMUDA NEEDS TO SURVIVE COVID-19 ......................... 23

IV.    EXPEDITED DISCOVERY IS NEITHER NECESSARY NOR APPROPRIATE. ........ 24

V.    IN THE EVENT THE COURT ENTERTAINS PLAINTIFF'S REQUEST FOR AN INJUNCTION, PLAINTIFF SHOULD BE REQUIRED TO POST A BOND EQUAL TO THE FULL VALUE OF THE ASSETS IT IS SEEKING TO FREEZE. ............................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.,*
No. 10 Civ. 232 (WHP), 2010 WL 4449366 (S.D.N.Y. Oct. 13, 2010)...........................21, 22

*Blank v. Noumair,*
239 A.D.2d 534, 658 N.Y.S.2d 88 (2d Dep't 1997) ................................................................19

*Delcon Const. Corp. v. U.S. Dep't of Hous. & Urban Dev.,*
205 F.R.D. 145 (S.D.N.Y. 2002) ............................................................................................16

*Envirotech Corp. v. Bethlehem Steel Corp.,*
729 F.2d 70 (2d Cir. 1984)......................................................................................................17

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
559 F.3d 110 (2d Cir. 2009)....................................................................................................14

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
481 F.3d 60 (2d Cir. 2007) (per curiam)................................................................................14

*Great Earth Int'l Franchising Corp. v. Milks Devs., Inc.,*
302 F. Supp. 2d 248 (S.D.N.Y. 2004).....................................................................................23

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund,*
527 U.S. 308 (1999)...................................................................................................3, 14, 15

*Inter Impex S.A.E. v. Comtrade Corp.,*
No. 00 Civ. 0133(GBD), 2004 WL 2793213 (S.D.N.Y. Dec. 6, 2004)..................................19

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. And Trade Servs., Inc.,*
295 F. Supp. 2d 356 (S.D.N.Y. 2003).....................................................................................15

*JSG Trading Corp. v. Tray-Wrap, Inc.,*
917 F.2d 75 (2d Cir. 1990).......................................................................................................21

*Kolmar Americas, Inc. v. Koch Supply & Trading, LP.,*
No. 10 Civ. 7905 (JSR), 2012 WL 676354 (S.D.N.Y. Feb. 29, 2012).............................17-18

*Levy v. Young Adult Inst., Inc.,*
No. 13-cv-2861 (JPO), 2015 WL 170442 (S.D.N.Y. Jan. 13, 2015)......................................25

*Litwin v. OceanFreight, Inc.,*
865 F. Supp. 2d 385 (S. D.N.Y. 2011)....................................................................................23

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.,*
  75 F. Supp. 3d 592 (S.D.N.Y. 2014)............................................................................ 22, 24

*Pac. Elec. Wire & Cable Co. v. Set Top Int'l Inc.,*
  No. 03 Civ. 9623 (JFK), 2003 WL 23095564 (S.D.N.Y. Dec. 30, 2003) ..............................23

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.,*
  No. 11 Civ. 3489 (JMF), 2013 WL 1915330 (S.D.N.Y. May 9, 2013)..................................15

*Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.,*
  292 F. Supp. 3d 601 (S.D.N.Y. 2017)...............................................................................22

*In re South Side House, LLC,*
  474 B.R. 391 (Bankr. E.D.N.Y. 2012)...............................................................................18

*Stratton Grp., Ltd. v. Sprayregen,*
  458 F. Supp. 1216 (S.D.N.Y. 1978)..................................................................................18

*Sunset Homeowners Ass'n, Inc. v. DiFrancesco,*
  386 F. Supp. 3d 299 (W.D.N.Y. July 3, 2019) ...............................................................15, 16

*Toray Int'l Am., Inc. v. Nakayama,*
  No. 14 Civ. 3016 (GHW), 2014 WL 12543817 (S.D.N.Y. Apr. 29, 2014)...........................15

*Tucker Anthony Realty Corp. v. Schlesinger,*
  888 F.2d 969 (2d Cir. 1989)............................................................................................21

*Weber v. King,*
  110 F. Supp. 2d 124 (E.D.N.Y. 2000) ..........................................................................16, 17

## Other Authorities

*Black's Law Dictionary* (11th ed. 2019)..................................................................................19

Fed. R. Civ. P. 19.........................................................................................................15, 16, 17

Fed. R. Civ. P. 65..............................................................................................................3, 25

Defendants Hudson's Bay Company ULC (formerly known as Hudson's Bay Company) ("HBC")[1] and HBC L.P. ("HBC Bermuda," and together with HBC, "Defendants") respectfully submit this memorandum of law in opposition to Plaintiff's motion for a preliminary injunction.

## PRELIMINARY STATEMENT

Plaintiff Situs Holdings, LLC has commenced this action with much publicity claiming that it is entitled to a broad injunctive "asset freeze" because Defendants, which own a Canadian retail business group that includes Hudson's Bay, Saks Fifth Avenue, Saks Off Fifth, and other retail assets, in the dead of night allegedly "stripped assets" in violation of a loan agreement, supposedly leaving Plaintiff with impaired collateral. Situs, which claims to represent investors who hold debt securities, is in precisely the same economic position it was in before the so-called "asset stripping" and its collateral has not been impacted at all. This lawsuit is nothing more than a transparent attempt to gain leverage in negotiations with borrowers who are trying to do the best they can in the face of the global pandemic. Given its sweeping and inappropriate request for a freeze covering billions of dollars of Defendants' assets, Situs's claim that the relief sought is "modest" or "limited" borders on the frivolous. (To put the relief and this lawsuit in context, the borrowers have defaulted on a total of $7.4 million in debt payments for April and May and were in the middle of discussions with Situs when it filed this action.)

Even on this truncated record Plaintiff does not come close to establishing the elements necessary in the Second Circuit to justify preliminary injunctive relief, much less a broad injunction covering billions of dollars of assets while Plaintiff litigates the merits of a claim that

---

[1] Plaintiff names Hudson's Bay Company and Hudson's Bay Company ULC as separate defendants in this case. Hudson's Bay Company ULC, however, is the same entity as Hudson's Bay Company—the only reason that it has a slightly different name is because it converted into a Canadian unlimited liability company and changed its name. (*See* Putnam Decl. ¶ 14 & Ex. 10 (Certificate of Change of Name); Mann Decl. ¶¶ 3-7.)

is doomed to fail.  HBC is not even a party to the loan agreement Plaintiff seeks to enforce in this action.  For whatever reason, Plaintiff chose not to sue *the borrowers* under the loan agreement, rendering its contract claims defective on their face for failure to join indispensable parties. Regardless of that threshold issue, the provisions governing "Permitted Transfers" in the relevant loan documents squarely permit the internal corporate reorganization that is at issue here.

HBC *is* party to various operating lease guarantees but there is no basis to claim that any of those guarantees were breached.  The only restriction contained in those guarantees of borrowers' operating leases is that HBC cannot assign the contract itself—which HBC did <u>not</u> do. Plaintiff's rights under those guarantees remain intact; indeed, they have been expanded based upon an additional agreement provided to Plaintiff by HBC Bermuda pursuant to which HBC Bermuda agreed to assume the operating lease guarantee obligations of HBC while leaving in place the HBC guarantee.  Thus, Plaintiff now has two guarantors for borrowers' operating leases. Together those guarantors own all the same assets that HBC owned prior to HBC's internal restructuring.  In short, Plaintiff is in exactly the same position as it was before.

Unable to address the legally permissible, Situs turns to hyperbole suggesting that a name change from HBC to HBC ULC shows that there was a scheme to "dissolve" and "strip assets" and place them outside the control of the Lenders.  Plaintiff is dead wrong on that too.  HBC ULC is the same entity as HBC—the only reason that it has a slightly different name is because it converted to a Canadian unlimited liability company.  And Plaintiff's repeated mantra that the transactions being challenged were somehow done in the dead of night or without transparency is just incorrect, as the accompanying declarations demonstrate.

Defendants show below the myriad reasons why Plaintiff's request for an injunction should be rejected, starting with the unbroken line of authority from the Supreme Court in the seminal

*Grupo Mexicano* case that asset freezes in aid of contract claims to obtain or protect a money judgment are simply not available under Rule 65, Fed. R. Civ. P.  Frankly, the relief sought here would effectively give Situs security in assets that it never bargained for.

In addition to the flawed claims on the merits, there is little doubt that Plaintiff is not in danger of suffering irreparable harm.  At the risk of simplification, Plaintiff is asserting that Defendants breached operating lease guarantees and a loan agreement by transferring assets that Plaintiff claims may later be needed to satisfy their financial obligations to Plaintiff.  To state the obvious, that is clearly a claim that is redressable by money damages.  To the extent there is a loan default, Plaintiff would have recourse to the actual collateral for which it bargained—which is valued at over a billion dollars based upon the most recent appraisals by Cushman & Wakefield. There is no suggestion that if Situs calls a payment default that the assets in which it has a security interest will be insufficient to make the lender whole.  And not a single step in HBC's internal restructuring has interfered with Plaintiff's right to call a default, nor did it undermine Plaintiff's ability potentially to enforce any operating lease guarantees against Defendants, with the same assets available to them as they had regardless of HBC's internal restructuring.

Finally, an asset freeze of the nature sought here would have catastrophic consequences for Defendants, which explains why the balance of hardships and public interest decidedly tips in Defendants' favor.  COVID-19 has had a devastating human and financial cost to Defendants, as the accompanying declaration of Ian Putnam demonstrates.  If the Court issues an injunction freezing assets it will cripple HBC's efforts to get its retail stores reopened in a staged and safe manner for employees and associates.  HBC is a major retailer and the misleading publicity that Plaintiff has generated with this lawsuit is already impacting its vendors, suppliers and employees. An asset freeze of any nature would significantly interfere with HBC's supply chains and make it

much more difficult to respond to the challenges of COVID-19.  Defendants need the flexibility to work with their assets to ensure that the recovery from COVID-19 is effective and safe.

In sum, an asset freeze order, no matter how "modest" or "limited," that impacts billions of dollars of real estate and department stores because Plaintiff supposedly was unaware of the precise details of an internal restructuring of which it was clearly on notice—and which has not prejudiced it in the slightest—would be a draconian and unprecedented remedy.

### STATEMENT OF FACTS

The following summary sets forth the facts relevant to this motion and is based on the Declaration of Ian Putnam, President of Real Estate and Chief Corporate Development Officer for Hudson's Bay Company Group (the "HBC Group"), the Declaration of Jonah Mann, a partner at Stikeman Elliott LLP, and the Declaration of Paul Smith, a Bermuda barrister and partner at Conyers Dill & Pearman, as well as the exhibits to the Complaint.

**A.    None Of The Loan Documents Restricts HBC From Conducting An Internal Restructuring Of Its Corporate Group.**

This lawsuit arises from a loan transaction completed on July 22, 2015, pursuant to which a group of 34 special purpose entities (collectively, "Borrowers") borrowed $846,220,966 (the "Loan") from JPMorgan Chase Bank, N.A., Column Financial, Inc. and Bank of America, N.A. (collectively, the "Original Lender").  (Putnam Decl. ¶ 3.)  The Loan is governed by a Loan Agreement, dated July 22, 2015, and annexed to the Complaint as Exhibit 7.  The Loan was subsequently securitized in a CMBS transaction, with the Original Lender assigning all its rights, title and interest in and to the loan to Wilmington Trust, N.A. (the "Lender"), as trustee for the holders of Hudson's Bay Simon JV Trust 2015-HBS, Commercial Mortgage Pass-Through Certificates, Series 2015-HBS.  (*Id.*)  Situs Holdings, LLC is the Special Servicer hired by Lender.

- 4 -

The Borrowers are all wholly owned subsidiaries of HBS Global Properties LLC ("HBS"), a joint venture between indirect subsidiaries of HBC Bermuda and third parties. (Putnam Decl. ¶ 4.) They each own or hold ground leases in 34 properties (the "Properties") mortgaged to the Lender to serve as collateral for the Loan pursuant to the Loan Agreement and 34 Deeds of Trust. (*Id.*; *see, e.g.*, Compl. Exs. 5, 6.) Based on their most recent appraisal by Cushman & Wakefield in July 2019, the Properties have an as-is value of *over $1.235 billion*—which is more than sufficient to repay the Loan plus interest in full. (Putnam Decl. ¶ 4.)

Borrowers are landlords which have leased the Properties pursuant to operating leases (the "Operating Leases") to department stores operating under the Saks Fifth Avenue and Lord & Taylor brand names. (*Id.*; Compl. Exs. 3 & 4.) These tenants pay the Borrowers fixed rent each month in the aggregate amount of $8,280,315.79. (Putnam Decl. ¶ 4.) In the Operating Lease Guarantees, HBC guaranteed the payment of these rents to Borrowers. (Compl. Exs. 1 & 2 ¶ 2.1.)

Although the underlying agreements are lengthy and complex, the basic facts necessary to deny this motion are simple and straightforward:

*First*, the only agreements relating to the Loan to which HBC was ever a party are the Operating Lease Guarantees. (*See generally* Compl. Exs. 1-7.) The Operating Lease Guarantees guaranteed the Borrowers' tenants rent obligations, but they did not guarantee the Loan. HBC is not, and never agreed to be, the guarantor on the Loan. (This in contrast to HBS—Borrowers' parent—which did provide a limited guarantee for the Loan under certain circumstances not applicable here.) Plaintiff is just wrong to assert that Lender could "call on its absolute and unconditional Operating Lease Guarantees for repayment of the Loan." (Opening Br. at 4.)

*Second*, HBC never granted a security interest in any of its assets to backstop the Operating Lease Guarantees and never agreed to any transfer restrictions on its assets in the Operating Lease

Guarantees.  No provision of the Operating Lease Guarantees imposes any restriction on the sale, transfer or other disposition of HBC's assets.  And Plaintiff does not identify any such provision in the Operating Lease Guarantees—because it does not exist.  Instead, Plaintiff claims that HBC breached Section 4.5, which only prohibits the "assignment of this Agreement"—not the transfer of HBC's assets—without the consent of "Beneficiary" (*i.e.*, Borrowers, not Lender).   As discussed below, this anti-assignment provision is not implicated because HBC never assigned the Operating Lease Guarantees and still remains bound by their terms.  (Putnam Decl. ¶ 5.)

*Third*, HBC is not a party to any of the remaining "Loan Documents"—a detail that Plaintiff obscures, we assume deliberately, by lumping them all together with the Operating Lease Guarantees.  Indeed, the Operating Lease Guarantees are not even included within the definition of "Loan Documents" in the Loan Agreement itself.  (Compl. Ex. 7 at 20 (definition of "Loan Documents").)[2]  HBC is <u>not</u> a Borrower, HBC is <u>not</u> a party to the Loan Agreement, HBC is <u>not</u> a party to the Deeds of Trust, and HBC is <u>not</u> a party to the Operating Leases.  HBC could not have breached any of these agreements because it never owed any contractual obligations under them.  Borrowers are Lender's counterparties in each of these agreements and, while Plaintiff asserts they were breached and purports to adjudicate Borrowers' rights, Plaintiff chose not to sue Borrowers.

This is important because the only transfer restrictions in any of the so-called "Loan Documents" are contained in the Loan Agreement.  But, by their plain and unambiguous terms, the transfer restrictions contained in Section 5.2.10 of the Loan Agreement only restrict Borrowers—Lender's actual counterparty to the Loan Agreement—not Defendants.  (Compl. Ex. 7 § 5.2.10(b) ("Without the prior written consent of Lender, which consent shall not be

---

[2] Although the definition of Loan Documents references a "Guaranty" and a "Guarantor," the Guaranty referred to is the limited guaranty executed by Lord & Taylor Acquisition, Inc. (which was succeeded by HBS).  (Compl. Ex. 7 at 15 (definition of "Guaranty" and "Guarantor").)

unreasonably withheld, conditioned or delayed, *Borrower shall not, and shall not permit any Restricted Party to do*, any of the following (collectively, a "Transfer") (emphasis added).)  Thus, to the extent Borrower did not comply with these transfer restrictions (which is not the case, as discussed below), this would constitute an Event of Default under the Loan Agreement and Deeds of Trust, and Lender could exercise its contractual remedies against Borrowers.  Unlike the Operating Lease Guarantees, which purport to void unauthorized assignments of the contract itself, the Loan Agreement does not state that a Transfer in violation of Section 5.2.10 is void.

In any event, these transfer restrictions exist to protect Lender's collateral, the Properties.  This is made clear in Section 5.2.10(a) of the Loan Agreement, which states as a predicate for the transfer restrictions contained in Section 5.2.10 as follows:  "Borrower acknowledges that Lender has a valid interest in maintaining the value of the Properties so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Properties."  (Compl. Ex. 7.)  The Complaint is devoid of any allegation that the Properties do not remain fully intact and available to make Lender whole should it attempt to foreclose on its mortgage under the Deeds of Trust.

By contrast, transfers within the HBC Group—which do not impact the Properties in any way—are expressly permitted.  This is set forth in Section 5.2.10(d)(i) of the Loan Agreement:

> (A)  the Transfer of any ***indirect*** beneficial interests in Borrower, including in connect with the German Transfer and/or the formation of a REIT or a Merger, ***or*** (B) the ***Transfer to an Affiliate of HBC***, SPG LP or Simon, provided that following any such Transfer (x) either HBC or Simon or SPG LP owns at lease twenty percent (20%) of the direct or indirect equity interests in Borrower in the aggregate and (y) HBC and/or Simon or SPG LP Controls Borrower.

(Compl. Ex. 7 (Emphasis added).)  As defined in the Loan Agreement, HBC means "Hudson's Bay Company, a Canadian corporation, and its permitted successors and permitted assigns." (Compl. Ex. 7 at 15.)  As discussed below and in Mr. Putnam's declaration, HBC Bermuda

succeeded HBC as the ultimate parent of the HBC Group, and indirectly owns approximately 60% of the equity interests in Borrower and has "Control" as defined in the Loan Agreement.  (Putnam Decl. ¶ 17.)

Lest there be any doubt about the freedom of HBC's owners to make a Transfer (including the transfer of their indirect ownership interests in Borrowers' ultimate US parent without notice to Lender) within the HBC Group, the Loan Agreement further makes clear:

> Notwithstanding anything to the contrary set forth herein or in any other Loan Document, there shall be **no restriction, notice or other requirement** on or with respect to any Transfer by any direct or indirect owner of HBC.

(Compl. Ex. 7 § 5.2.10(e) (emphasis added).)

In short, while Plaintiff alleges that HBC breached transfer restrictions in the Loan Agreement and Operating Lease Guarantees, it is not a party to the former (which was not breached in any event) and the latter contains no such restriction.  Inflammatory adjectives and misplaced accusations aside, the contracts at issue simply do not support Plaintiff's theory of liability as a matter of law.  And, as discussed in the next section, Plaintiff has the facts about HBC's ongoing existence and assets completely wrong too.

### B.    HBC Continues To Exist Following A Name Change With More Than Sufficient Assets To Satisfy Its Obligations Under The Operating Lease Guarantees—Which Were Never Assigned To Anyone.

Plaintiff clearly has a flare for the dramatic.  As Plaintiff would have it, to avoid their obligations under the Operating Lease Guarantees, Defendants surreptitiously "stripped" HBC of its assets, rendered it an empty "shell," and then "extinguished HBC's very existence."  (Opening Br. at 1-2.)  None of this is true.  Defendants tried to explain the actual facts on multiple occasions so that we could avoid this terrible waste of time and money, but Plaintiff refused to listen or accept the truth because it did not fit with its preconceived narrative.

- 8 -

Until recently, HBC was a Canadian public company.  (Putnam Decl. ¶ 8.)  It served as the top-level holding company in the HBC Group, owning and operating department stores, including Hudson's Bay, Galeria Kaufhof, and Saks Fifth Avenue and Saks Off Fifth, through direct and indirect subsidiaries in Canada, the United States, and Europe.  (*Id.*)

On October 21, 2019, HBC publicly announced that it entered into an Arrangement Agreement with a group of HBC shareholders to take the Company private (the "Take-Private Transaction").  (Putnam Decl. ¶ 7 & Ex. 3.)  In addition, in connection with the shareholder vote to approve the Take-Private Transaction, HBC publicly disclosed that HBC had committed to "perform such reorganizations of its corporate structure, business, operations and assets or such other transactions" as its new owners would request.  (*Id.* Ex. 11.)  The Transaction was completed on March 3, 2020.  (*Id.*)  Contrary to Plaintiff's cries of "clandestine corporate shell games" and "concealed corporate restructurings," HBC's Take-Private Transaction and related disclosures received extensive press attention and could not possibly have escaped Plaintiff's notice.

Through the Take-Private Transaction, HBC's public shareholders were cashed out and HBC became wholly owned by a group of private shareholders.  (Putnam Decl. ¶ 9.)  As is typically the case following a take-private transaction, and as was publicly disclosed prior to its completion, HBC's new private owners wished to restructure the Hudson's Bay corporate family through an internal restructuring (the "Internal Restructuring") to optimize their Canadian and foreign operations and assets from a tax perspective.  (*Id.*)  HBC engaged nationally recognized legal and tax advisors, including Deloitte, to assist in this corporate reorganization.  (Putnam Decl. ¶¶ 9-10.)  Through this Internal Restructuring, the entities in HBC Group were reorganized, with a newly formed entity, HBC Bermuda, succeeding to HBC's US assets and its position as ultimate

parent entity of the HBC Group.  (Putnam Decl. ¶ 17.)  Simplified before and after structure charts, which were shared with Plaintiff on April 28, 2020, are included in Mr. Putnam's declaration.

Notably, as was made clear to Plaintiff, HBC continues to exist; it was simply renamed HBC ULC after it was converted under the laws of British Columbia into an unlimited liability company.  (Mann Decl. ¶¶ 3-7; Putnam Decl. ¶¶ 11-15.)  That this was merely a name change is confirmed by a document entitled Certificate of Change of Name.  (Putnam Decl. Ex. 10; Mann Decl. ¶¶ 3-7.)  The rumors of HBC's demise are therefore greatly exaggerated.[3]

Not only does HBC continue to exist, but it also continues to remain bound by the Operating Lease Guarantees.  (Putnam Decl. ¶ 18.)  They were never assigned by HBC to anyone else.  (*Id.*)  Plaintiff has no basis to assert otherwise.  Indeed, far from alleging that an assignment actually transpired, Plaintiff's allegation is that consent would have been required "to the extent that" the Operating Lease Guarantees were assigned to HBC Bermuda.  (Compl. ¶ 58.)  So, even Plaintiff cannot allege that there was a breach of the anti-assignment provision.

Plaintiff's suggestion that it was "shocked" that HBC would want to sign a proposed pre-negotiation agreement using its correct name—Hudson's Bay Company ULC—is completely overblown.  So too are its claims that Defendants "concealed" the Internal Restructuring, and "deliberately hid" what they were doing from Plaintiff.  (Opening Br. at 6.)  Like many of Plaintiff's inflammatory claims, no evidence is offered in support of this scurrilous allegation.  This was a corporate reorganization done in conjunction with a highly publicized take-private

---

[3] Plaintiff asserts that "Borrowers' counsel" wrote in an April 17, 2020 email that "HBC no longer existed."  (Opening Br. at 5-6.)  The email says no such thing.  Rather, Borrower's counsel told Plaintiff that following the restructuring Hudson's Bay Company "is an entity called Hudson's Bay Company ULC"—*i.e.*, that HBC had changed its name.  (Putnam Decl. Ex. 13.)  Regardless, after this exchange, Defendants provided corporate structure charts and other information, and offered to walk Plaintiff through the changes over the phone; an offer that Plaintiff never took up.

transaction, aided by well-respected advisers in multiple jurisdictions, where the fact that a reorganization would occur was publicly disclosed.

In addition, HBC continues to own through direct and indirect subsidiaries the same Canadian assets and operations, worth billions of dollars, that it did before the Internal Restructuring.  (Putnam Decl. ¶ 17.)  Based on recent estimates, these assets have a value in excess of $3 billion.  (*Id.*)  No basis exists to conclude that these assets are not sufficient for HBC to fulfill its obligations under the Operating Lease Guarantees should it be called upon to do so.  As noted above, the guaranteed rent payments amount to, at most, approximately $8.3 million per month. (Putnam Decl. ¶ 4.)  And this is not to mention the over $1.23 billion in collateral that is securing the Loan, which was not affected at all by the Internal Restructuring.

Finally, even though it was under no obligation to do so, HBC Bermuda entered into an Assumption Agreement in which it expressly assumed all the obligations under the Operating Lease Guarantees.  (Putnam Decl. Ex. 2.)[4]  HBC's guarantee obligations were left intact.  As a result, Plaintiff now has *two guarantors* who together own all the same assets that HBC owned prior to the Internal Restructuring.  This is hardly the conduct of a guarantor attempting to evade its obligations and there is no basis for Plaintiff to complain that it was prejudiced in any way by the Internal Restructuring—and certainly not to a degree that would warrant an indefinite pre-judgment asset freeze of Defendants' assets.

### C.    The Impact of the COVID-19 Pandemic.

In the Spring of 2020, HBC's operations were severely impacted by the COVID-19 pandemic.  (Putnam Decl. ¶ 20.)  As an important public health measure, many governments shut

---

[4] By doing so, HBC Bermuda consented to the jurisdiction of New York and is not contesting personal jurisdiction in this action.  As explained in Paul Smith's declaration, any future judgment against HBC Bermuda issued by a New York court would be readily enforceable in Bermuda.

down brick and mortar sales operations, causing Lord & Taylor LLC and Saks & Company LLC an immediate, steep drop in revenue.  (*Id.*)  These companies were unable to pay monthly rent owed to the Borrowers and the Borrowers, in turn, defaulted on the April and May debt service payments (totaling $7.4 million) owed to Lender under the Loan Agreement.  (*Id.*)

On April 1, 2020, Mr. Putnam, as an authorized signatory for Borrowers, sent a letter on their behalf to Situs Holdings, LLC, advising the Servicer that the Borrowers would be incapable of making the scheduled debt service payment as a result of the failure and inability of the Operating Lessees to pay the operating rent.  (Putnam Decl. Ex. 12.)  As Mr. Putnam explained, "[d]ue to [the] emergency circumstances [of the COVID-19 pandemic], which are outside of everyone's control, to ensure the safety of our customers and employees and in response to the closure of malls nationwide and to government mandates/recommendations, the Properties have been closed to the public."  (*Id.*)

Defendants are working diligently to reinitiate operations in their businesses and bring back online the employees who have been sidelined by the health crisis.  (Putnam Decl. ¶ 23.) Defendants have thousands of employees who were furloughed rather than terminated and they are slowly attempting to get them back to work.  (*Id.*)  Defendants are also preserving cash like all major retailers.  (*Id.*)  Although Borrowers have not made debt service payments for April and May totaling approximately $7.4 million, they are working feverishly to come up with alternative plans to resume debt payments as soon as the economy reopens.  (*Id.*)

### D.    Plaintiff's Lawsuit

On May 18, 2020, Plaintiff Situs Holdings, LLC, in its capacity as Special Servicer for Wilmington Trust, NA, filed its Verified Complaint alleging a single claim seeking a Declaratory Judgment that Defendants breached the "Loan Documents."  In paragraphs 94 through 98, Plaintiff alleges various obligations under the Operating Lease Guarantees, but does not allege how any of

those obligations were breached.   In paragraphs 99 through 105, Plaintiff alleges various obligations under the Loan Agreement (to which Defendants are not party) and alleges they were breached because Defendants made Transfers that were either not Permitted Transfers or because Defendants failed to give advance notice of Permitted Transfers.   Plaintiff then asks for a declaration—not a mandatory permanent injunction—declaring that the Transfers violated the Loan Agreement and Operating Lease Guarantees and are therefore "void."  (Compl. ¶ 111.)

In addition, the same day this lawsuit was filed, Plaintiff filed an OSC seeking a pre-judgment freezing order to paralyze all assets of HBC Bermuda—billions of dollars in assets that were never part of Plaintiff's collateral base and in which it has no security interest—and invasive expedited discovery.  This, despite the fact that Plaintiff is a lender that can count to the penny how much in debt service has not been paid in the last two months, how much HBC might owe if demanded under the Operating Lease Guarantees, how much debt remains to be repaid on the Loan, and clearly has recourse against the Borrowers and collateral to make it whole.

Not surprisingly, Plaintiff's claims of irreparable harm are vague and conclusory.  They say they "face continuing risk of irreparable harm" (Opening Br. at 9), but do not explain why or how.  They also say "this"—the reader does not know what "this" is—is "particularly so" because of the "economic impacts in this country of COVID-19" and "recent press reports" that Lord & Taylor may liquidate inventory upon reopening, not reopen some stores, and for "Saks to combine with the bankrupt Neiman Marcus."  (*Id.*)  How this translates into imminent, irreparable harm *to the Lender* if assets that were never part of its collateral and in which it has no security interest are not frozen is left entirely to the imagination.  These unfocused and generalized allegations of irreparable harm are reason enough to deny the preliminary injunction.

## ARGUMENT

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (internal quotation marks omitted); *see also Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund*, 527 U.S. 308, 329 (1999) (noting that the prejudgment restraint of assets has been characterized as the "nuclear weapo[n] of the law" (citation and internal quotation marks omitted)). A party seeking a preliminary injunction must demonstrate "(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009) (citation and internal quotation marks omitted).

Before turning to the elements themselves, there is a threshold issue here given the nature of Plaintiff's requested relief—a preliminary injunction to freeze all of Defendants' assets. The reason Plaintiff is seeking to freeze those assets is to make sure they are available in the event that Defendants are held liable to make payments that are contractually required pursuant to the Operating Lease Guarantees. Over and over, Plaintiff describes HBC as the "absolute and unconditional ultimate guarantor of the Loan" and that "it must step in and pay rent when the tenants are unable to do so for any reason." (Compl. ¶¶ 1, 6.) But it does not have a security interest or lien in any of the assets that it is seeking to freeze. It is therefore seeking to obtain through the equity powers of the Court what it never bargained for from Defendants.

This type of preliminary relief is barred by the Supreme Court's decision in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), in which the Court held that "the District Court had no authority to issue a preliminary injunction preventing

petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." *Id.* at 333; *see also Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11 Civ. 3489 (JMF), 2013 WL 1915330, at *2 (S.D.N.Y. May 9, 2013) ("*Grupo Mexicano* thus stands for the proposition that where a plaintiff creditor has no lien or equitable interest in the assets of a defendant debtor, the creditor may not interfere with the debtor's use of his property before obtaining judgment.") (internal quotation omitted). Although Plaintiff has not alleged a claim for money damages, its artful pleading of a declaratory judgment claim does not change that it is seeking impermissibly to invoke the Court's equity powers in aid of collecting a potential money judgment against Defendants. *See Toray Int'l Am., Inc. v. Nakayama*, No. 14 Civ. 3016 (GHW), 2014 WL 12543817, at *2 (S.D.N.Y. Apr. 29, 2014) (applying *Grupo Mexicano* to deny injunction where "Toray's action is, in essence, one seeking the legal remedy of damages"); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. And Trade Servs., Inc.*, 295 F. Supp. 2d 356, 389 (S.D.N.Y. 2003) ("[T]he equitable relief the plaintiff seeks is designed to effectuate the collection of money in satisfaction of that alleged legal liability. A preliminary injunction in this case would be issued in aid of the collection of a money judgment, not final equitable relief, an outcome barred by *Grupo Mexicano*."). This alone is sufficient to deny Plaintiff's motion out of the box.

## I.      PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS.

### A.      This Case Should Be Dismissed Pursuant To Fed. R. Civ. P. 19 Because Borrowers—The Actual Parties To The Loan Agreement—Are Not Defendants In This Case.

"[T]he nonjoinder of a necessary party is grounds to deny a preliminary injunction for failure to demonstrate a likelihood of success on the merits." *Sunset Homeowners Ass'n, Inc. v. DiFrancesco*, 386 F. Supp. 3d 299, 307 (W.D.N.Y. July 3, 2019). Under any analysis, there can be no serious question that Borrowers are a "required party" to this action. *See* Fed. R. Civ. P. 19(a)(1). "It is well established that a party to a contract which is the subject of the litigation is

considered a necessary party" under Rule 19. *Delcon Const. Corp. v. U.S. Dep't of Hous. & Urban Dev.*, 205 F.R.D. 145, 147 (S.D.N.Y. 2002) (quotation omitted).

A central issue in this case, of course, revolves around the purported breach of the Loan Agreement—a contract between Borrowers and Plaintiff. (*See* Compl. ¶ 111 (seeking a declaration that the alleged "Improper Transfers" violated "the provisions of the Loan Agreement").) Plaintiff is well aware that Borrowers are the proper defendants to this claim. Indeed, although they pretend otherwise now, prior to commencing this lawsuit against Defendants, Plaintiff's litigation threats, assertions of an Event of Default, and claims of breach based on these same alleged transfers were addressed directly by Plaintiff to Borrowers. (*Compare* Opening Br. at 7 ("By letter dated April 24, 2020 (the "April 24th Letter"), the Servicer advised HBC that it believed the Improper Transfers amounted to numerous, serious violations of the Loan Documents.") *with* Compl. Ex. 8 (April 24, 2020 letter directed to Borrower "Saks Dadeland Leasehold LLC" and *not* to HBC).) It is not clear why Plaintiff elected not to join Borrowers, other than that their joinder may destroy this Court's diversity jurisdiction because Borrowers are Delaware LLCs (where the Trust is a citizen) with their principal place of business in California (where Situs is located). They must be joined if feasible for this action to proceed and before a motion for preliminary injunction may be entertained. *See, e.g.*, *Sunset Homeowners*, 386 F. Supp. 3d at 306 (denying preliminary injunction without prejudice for failure to join a "required party" pursuant to Rule 19(a)).

Each of the Rule 19(b) factors also weighs in favor of dismissal to the extent that joinder of the Borrowers is not feasible. The "first and most important factor" in the Rule 19(b) analysis is "the extent to which a judgment rendered in the Company's absence might result in prejudice to the Company or any of those already parties." *Weber v. King*, 110 F. Supp. 2d 124, 129 (E.D.N.Y. 2000) (dismissing breach of contract action where plaintiffs failed to join indispensable party, the

company at the center of the dispute, and joinder would divest the court of diversity jurisdiction).

Here, the Borrowers are the fulcrum for all of the obligations purportedly breached in

Section 5.2.10(b) of the Loan Agreement and, if Plaintiff prevails, their rights under the Loan

Agreement will be directly impacted because any such breach would constitute an Event of Default

*for Borrowers*.  (*See* Compl. Ex. 7 § 8.1(a) (x), (xi).)  The fact that Defendants are the indirect

ultimate owners of Borrowers through a joint venture does not alter the analysis.  In *Weber*, for

example, the Court found that the first Rule 19(b) factor was satisfied even where the dispute was

between the owners of a company, but the company itself, a required party, was not joined.  *See*

*Weber*, 110 F. Supp. 2d at 129-30 ("If the Company's assets are threatened by the Additional

Defendants' picketing, only the Company has standing to challenge such a threat.").

The third and fourth factors in the Rule 19(b) analysis also support dismissal.  *See*

*Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70, 78 (2d Cir. 1984).  The Court should not

and cannot declare Plaintiff's rights under the Loan Agreement because no other party to the Loan

Agreement is a defendant in this case.  And Plaintiff has an adequate remedy if this case is

dismissed—it can proceed in state court.

## B.      Defendants Did Not Breach The Operating Lease Guarantees.

The Operating Lease Guarantees do not contain any asset transfer restrictions and do not

create any security interests in HBC's assets.   Simply put, HBC's assets—as opposed to

*Borrowers'* assets—were never part of Plaintiff's bargained-for collateral.  Plaintiff cannot and

does not assert otherwise.  Any asset transfers made by HBC in the Internal Restructuring therefore

could not have violated the Operating Lease Guarantees and they cannot be voided on this basis.

Because that is the only relief sought in this declaratory action, it is unavailable as a matter of law

and cannot support an asset freeze over assets that were never encumbered by the Operating Lease

Guarantees to begin with.  *See, e.g.*, *Kolmar Americas, Inc. v. Koch Supply & Trading, LP.*, No.

10 Civ. 7905 (JSR), 2012 WL 676354, at *3 (S.D.N.Y. Feb. 29, 2012) ("Contract remedies should not give the aggrieved party a windfall that places it in a better position.").

Nevertheless, Plaintiff alleges that the "Improper Transfers violated the Operating Lease Guarantees, which provide, at Section 4.5, that 'no assignment of this Agreement, in whole or in part, by Guarantor, may be made without the prior written consent" of the Lender.  (Compl. ¶ 58.)[5] Plaintiff does not allege there was an assignment in violation of this provision.  (*Id.*)

In any event, as explained in Mr. Putnam's declaration, there was no assignment at all by HBC.  (Putnam Decl. ¶ 5.)   HBC still is bound by the Operating Lease Guarantees.   (*Id.*) Accordingly, HBC did not violate Section 4.5 and there is no assignment to declare void.[6]

### C. Defendants Are Not Parties To The Loan Agreement And, In Any Event, Transfers By HBC In An Internal Restructuring That Left The Collateral Completely Intact Are Permitted.

As discussed above, Defendants are not parties to the Loan Agreement.  They are not bound by its terms and are not restricted from making transfers by Section 5.2.10(b), which expressly

---

[5] Notably, Section 4.5 does not grant the Lender consent rights.  (*See* Compl. Ex. 1 § 4.5.)  Rather, the "Beneficiary" (*i.e.*, the Borrowers) hold the consent rights.  (*Id.*)  While Plaintiff alleges that these rights were assigned to Lender, this was only a *collateral* assignment that is not effective until Lender exercises its rights as mortgagor after an Event of Default, as Section 4.5 itself makes clear.  (*Id.* ("Guarantor hereby acknowledges and agrees that this Guaranty has been <u>collaterally assigned</u> to the Current Mortgagee pursuant to the Current Loan Documents.") (emphasis added).) This issue was addressed in *In re South Side House, LLC*, 474 B.R. 391 (Bankr. E.D.N.Y. 2012), which explained that "New York courts interpret rent assignment clauses to be additional security even when they contain terms such as 'absolute' and 'unconditional,'" and that "the language used in the assignment instrument itself is not determinative of what rights are actually transferred."  *Id.* at 403 (citations omitted).  Thus, the consent rights that Lender purports to invoke are not its own. Because there was not assignment here to begin with, the Court not need decide this issue.

[6] Plaintiff also makes reference to Section 3.1(a) and (e) of the Operating Lease Guarantees and contends that they "require that HBC continue to be 'validly existing' with 'the financial capacity to pay and perform its obligations under this Guaranty.'"  (Compl. ¶ 98.)  These are representations and warranties made at the time the Guarantees were executed and Plaintiff does not allege they were false.  They do not impose an ongoing obligation on HBC.  Regardless, HBC is a "validly existing" company with billions of dollars of assets.  (Putnam Decl. ¶ 17.)

restricts only Borrowers.  It is axiomatic that a breach of contract claim cannot be asserted against someone who is not a party to the contract.  *See, e.g.*, *Inter Impex S.A.E. v. Comtrade Corp.*, No. 00 Civ. 0133 (GBD), 2004 WL 2793213, at *3  (S.D.N.Y. Dec. 6, 2004) ("Without a contractual relationship, there can be no alleged breach."); *Stratton Grp., Ltd. v. Sprayregen*, 458 F. Supp. 1216, 1218 (S.D.N.Y. 1978) ("Before defendant may be held accountable for the breach of a contract, it must be demonstrated that he was a party thereto. Clearly a breach can only occur when one is under an obligation to perform in the first instance."); *Blank v. Noumair*, 239 A.D.2d 534, 534,  658 N.Y.S.2d 88, 88 (2d Dep't 1997) (affirming trial court's dismissal of a breach of contract action where "the defendant was not a party to the agreements in question.").

In any event, transfers within HBC Group—which did not affect Lender's collateral in the Properties—were expressly permitted by the Loan Agreement.  Section 5.2.10(d)(i) permits "the Transfer of any *indirect* beneficial interest in Borrower" so long as HBC continues to own 20% of the "direct or indirect equity interests in Borrower" and "Controls Borrower."  (Compl. Ex. 7 (emphasis added).)  These conditions are all satisfied here.  The Transfers by HBC were of its indirect beneficial interests in Borrower—namely it transferred HBC's direct and indirect US subsidiaries to its new parent, HBC Bermuda.  (Putnam Decl. ¶ 17.)  This did not impact Lender's collateral—all the downstream entities remain intact.  Following this transfer, HBC, which the Loan Agreement defines to include its "permitted successors" (*i.e.*, HBC Bermuda) continues to own 20% of the indirect equity interests in Borrowers and had Control over Borrower.[7]  Nothing

---

[7] As used in the Loan Agreement, "permitted successors" is not a defined term.  In ordinary usage, "successor" means "1. Someone who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows a predecessor. 2. A corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." *Black's Law Dictionary* (11th ed. 2019).  HBC Bermuda has succeeded to HBC's role as ultimate parent entity for HBC Group, and owns certain of HBC's assets.  It is HBC's permitted successor based on the ordinary meaning of the term.

in that regard has changed; HBC Group's ultimate parent entity (HBC Bermuda as successor to HBC) continues to own HBC's indirect US subsidiaries.  (*See supra* at 7-8.)

Plaintiff largely ignores Section 5.2.10(d)(i) and instead spends pages focusing on Section 5.2.10(d)(iv), presumably because this provision has additional requirements concerning the "Transfer Eligibility" of a "Qualified Transferee."  (Compl. ¶¶ 62-67.)  This is a red herring. The concepts of "Transfer Eligibility" and "Qualified Transferee" are not relevant to Section 5.2.10(d)(i) and cannot justify the expansive and invasive discovery sought by Plaintiff.

Putting aside the transfers themselves, Plaintiff also asserts that they may be voided entirely because Defendants did not provide advance notice of them.  No notice was required under the Loan Agreement.  As noted above, the notice provision on which Plaintiff relies, Section 5.2.10(e) of the Loan Agreement, contains an express exception at the end which states that "there shall be no restriction, notice or other requirement on or with respect to any Transfer by any direct or indirect owner of HBC."  (Compl. Ex. 7.)  As part of the Internal Restructuring, HBC's owners created HBC Bermuda to be HBC's parent.  Under Section 5.2.10(e), the Transfer of indirect interests in Borrower by HBC's owners to HBC's parent was permitted and did not require notice.

Finally, no basis exists for the requested remedy—a declaration that transfers that have already been completed and which do not affect Lender's collateral are "void" pursuant to the Loan Agreement.  The Loan Agreement affords Lender no such remedy.  To the extent Borrowers did not comply with Section 5.2.10(b) or (e), this would only trigger an Event of Default pursuant to Section 8.1 and Lender could exercise its bargained-for remedies against Borrowers.  (*See* Compl. Ex. 7 § 8.1(a)(x), (xi).)  Nothing in the Loan Agreement provides that Transfers made without Lender's consent are void, much less Transfers made by someone who is not a party.

## II.   PLAINTIFF HAS NOT DEMONSTRATED THAT IT WILL SUFFER IRREPARABLE HARM ABSENT THE FREEZING ORDER IT SEEKS.

This entire case is about money.  Plaintiff is owed a specific amount of money by Borrowers that they have an obligation to repay and, if they do not, Plaintiff can exercise its remedies against the Properties they mortgaged as collateral.  Plaintiff's claim here is that it also may have the right to seek money from HBC under the Operating Lease Guarantees to the extent that the lessees of the Properties do not pay their rent, and now wants to be sure that HBC can afford to pay what it promised if and when Plaintiff tries to collect.  With multiple sources of repayment, and with only two debt service payments missed totaling $7.4 million, it is difficult to understand how Plaintiff can claim to have suffered any harm, much less irreparable and imminent harm warranting the extraordinary pre-judgment freezing order it seeks.

To begin with, Plaintiff's breach of contract claim can adequately be redressed through readily quantifiable money damages.  Although Plaintiff creatively styles its request for relief as seeking to enforce its right to know and control the identity and financial wherewithal of its alleged guarantor, that relief is merely incident to its hypothetical, unasserted claim for money under the Operating Lease Guarantees.  Whether it is owed $7.4 million (the missed debt service payments), $850 million (the full amount of the Loan), or some amount in between, a monetary payment is available to make it whole.  Plaintiff's damages are therefore not irreparable.  *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) ("Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation a preliminary injunction should not issue."); *Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.*, No. 10 Civ. 232 (WHP), 2010 WL 4449366, at *6 (S.D.N.Y. Oct. 13, 2010) (same).

Plaintiff's alleged harm is also not "actual and imminent."  *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989).  No showing has been made that Plaintiff has

suffered any harm due to the Internal Restructuring, or that further harm is imminent.  Plaintiff has

a primary source of recovery—the Borrowers—and there is no evidence that they and their

collateral cannot make Plaintiff whole for missed debt service and the Loan.  *See Bank Midwest*,

2010 WL 4449366, at *6 (finding no irreparable harm because "Bank Midwest is suing Hypo, not

the borrower, East Berry. If Bank Midwest prevails here, it will have recourse against Hypo and

cannot assert that its only hope of repayment lies in the collateral under the Agreement.").   Any

actual harm resulting from transfers made by HBC is therefore entirely speculative.

Putting that aside, Plaintiff has offered no evidence that HBC's transfer of a portion of its

assets to HBC Bermuda diminished any rights it might have to obtain recovery under the Operating

Lease Guarantees.  There is no evidence that HBC—which retained substantial assets as discussed

above—cannot satisfy its financial obligations (which can be no greater than the $7.4 million in

recently missed debt payments) under the Operating Lease Guarantees.  *See Patriarch Partners*,

292 F. Supp. at 603 (no irreparable harm where plaintiffs failed to "meet their burden to show that

PPAS lacks sufficient assets to satisfy a money judgment should the Zohar Funds prevail at trial").

Regardless, HBC Bermuda entered into an Assumption Agreement, which was provided

to Plaintiff, in which it agreed to all the obligations under the Operating Lease Guarantees.

(Putnam Decl. Ex. 2.)  Plaintiff therefore has the same potential recourse under the Operating

Lease Guarantees, supported by the same assets, as it did before any transfers were made.

Courts in this district have rejected similar requests for preliminary injunctions arising from

intra-family asset transfers that were allegedly made to evade debts.  *See Marblegate Asset Mgmt.

v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 608 (S.D.N.Y. 2014) (finding no irreparable harm

because, "[s]hould Plaintiffs prevail at trial and convince the Court to find EDMC liable for

payment on their Notes, they have offered no reason to believe that they cannot obtain relief from

EDMC, EM Holdings, or whatever other subsidiary takes hold of the assets disposed of through the Intercompany Sale."); *Great Earth Int'l Franchising Corp. v. Milks Devs., Inc.*, 302 F. Supp. 2d 248, 254 (S.D.N.Y. 2004) (finding no irreparable harm where there "is no basis in the record to suggest that a judgment recovered by the Franchisees against GEIFC, if unsatisfied by that company, could not be enforced against other Good Earth companies or officers, through corporate veil-piercing or other procedures"); *Pac. Elec. Wire & Cable Co. v. Set Top Int'l Inc.*, No. 03 Civ. 9623 (JFK), 2003 WL 23095564, at *5 (S.D.N.Y. Dec. 30, 2003) ("Were APWC Gen'l to strip the assets of APWC, Set Top could still be returned to the position it previously occupied by an award of monetary damages against the persons or corporations responsible for the stripping.").  In each of these cases, the court denied the preliminary injunction because plaintiff could pursue recovery against a corporate family member notwithstanding the asset transfer on a veil piercing or other similar theories of liability.  That is the case here—and by HBC Bermuda's own agreement.

Finally, no evidence exists of any immediate, impending harm or threats to Plaintiff.  As discussed above, the Internal Restructuring was completed over two months ago.  Plaintiff has not produced any evidence that any entity is "about to vanish entirely, or remain only as a shell totally devoid of assets."  *Great Earth*, 302 F. Supp. 2d at 254.  For the same reasons, the "consent" cases on which Plaintiff relies (at 15) are distinguishable.  Because the Internal Restructuring has been completed, freezing Defendants' assets now does nothing to preserve Plaintiff's purported consent rights.  Press reports about Neiman Marcus or Lord & Taylor's plans to reopen do not change this.

## III.   THE BALANCE OF HARDSHIPS TIPS DECIDEDLY AGAINST FREEZING ASSETS THAT HBC BERMUDA NEEDS TO SURVIVE COVID-19.

"A preliminary injunction may not issue unless the movant clearly shows that the balance of equities favors the movant."  *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 401 (S.D.N.Y. 2011).  Here, the negative impact of an injunction that freezes Defendants' assets, during this

critical time when they need maximum flexibility, cannot be understated.  (Putnam Decl. ¶ 23.)  It would cripple Defendants' efforts to get stores reopened in a staged and careful manner and return employees back to work.  (*Id.*)  It would also significantly interfere with HBC's supply chains and undermine HBC's ability to respond to the challenges of COVID-19.  (*Id.* ¶ 24.)

On a similar application, Judge Failla denied corporate bondholders' motion for a preliminary injunction where the "Plaintiffs face[d] the potential loss of ability to recover interest and principle on Notes worth, nominally, just over $20 million" but defendant faced crippling damage to a billion-dollar company.  *Marblegate*, 75 F.Supp.3d at 609-10 ("[T]here is little question that the harms on Defendants' side of the ledger vastly outweigh those on Plaintiffs'").  Similarly, Plaintiff faces, at best, speculative financial harm and is seeking a wildly expansive injunction against Defendants, the impact of which would be catastrophic.

## IV.    EXPEDITED DISCOVERY IS NEITHER NECESSARY NOR APPROPRIATE.

Plaintiff has put the cart before the horse.  As discussed above, Plaintiff is not likely to succeed on the merits—indeed, all necessary parties are not even before the Court—and it stands to suffer no irreparable injury or prejudice if discovery proceeds in the ordinary course.  Nevertheless, in what appears to be a transparent effort to extract leverage in ongoing discussions, Plaintiff asks this Court to direct Defendants to respond, while many remain at home, to a set of 25 document requests (including subparts) and 12 interrogatories that seek extremely broad and burdensome discovery at a time when the parties should be trying to work things out and Defendants need to focus on their business.  The requests themselves are beyond the pale—for example, they seek, among many other things, *all* documents relating to the Take-Private Transaction and Plaintiff's Collateral for reasons that are impossible to comprehend.

None of this discovery is tailored to any particular request for urgent relief and there is no legitimate basis to deviate from the regular civil discovery schedule, assuming the case even

survives a motion to dismiss.  Accordingly, Defendants respectfully submit that they should not be forced to respond on Plaintiff's artificial timetable and its request for expedited discovery should be denied.  *See Levy v. Young Adult Inst., Inc.*, 2015 WL 170442, at *6, *11 (S.D.N.Y. Jan. 13, 2015) (denying expedited discovery).

**V.     IN THE EVENT THE COURT ENTERTAINS PLAINTIFF'S REQUEST FOR AN INJUNCTION, PLAINTIFF SHOULD BE REQUIRED TO POST A BOND EQUAL TO THE FULL VALUE OF THE ASSETS IT IS SEEKING TO FREEZE.**

Under Rule 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Here, Plaintiff seeks to freeze all of Defendants' assets during a global pandemic that has shuttered all their department stores. Defendants need flexibility and control over their assets at this critical time.  The injunction literally puts billions of dollars at risk.  To the extent Plaintiff's request is granted, and it should not be for all the reasons discussed above, a bond should be required in the amount of $7.4 billion, which represents the most recent estimate of the value of Defendants' assets.  (Putnam Decl. ¶ 17.)

<u>**CONCLUSION**</u>

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's motion for a preliminary injunction and for expedited discovery in its entirety.

Dated:  May 23, 2020

WILLKIE FARR & GALLAGHER LLP

By:  ___/s/ Tariq Mundiya_____
Tariq Mundiya
Jeffrey B. Korn
Randall W. Jackson
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendants*